[L. A. No. 11133. In Bank.—January 27, 1932.]

JO DELL KERSHAW, a Minor, etc., Respondent, v. LLOYD E. TILBURY et al., Appellants.

Hahn & Hahn, D. A. Knapp, Victor E. Shaw and G. C. O'Connell for Appellants.

Hewitt, McCormick & Crump, Leslie R. Hewitt and Roy W. Colegate for Respondent.

THE COURT.—A hearing was granted in this case in order that we might more fully consider the propriety of the award of damages. Upon such consideration, we adopt that part of the opinion of the District Court of Appeal which deals with the other issues involved in the action, as follows:

"This is an action for damages brought by Jo Dell Kershaw, by her guardian *ad litem*, against the defendants Lloyd E. Tilbury and Helen L. Tilbury, as physicians, for alleged malpractice. The salient facts of the case are about as follows:

"On July 7, 1927, the plaintiff being about 9 years of age, suffered pain in her left leg just above her ankle. The mother, who is her guardian *ad litem* herein, called a physician, who advised her that pus was forming on the bone similar to a bone felon. He advised her to make arrangements to take her to a hospital and have an X-ray made and an operation performed and that the child was suffering from an infection known as osteomyelitis. The child had, for her age become proficient in toe dancing. The mother, fearing an operation would leave an ugly scar on the child's leg and that an operation might result in permanently disabling her daughter from future dancing, sought the services of a drugless physician. Disclosing these facts to a neighbor, she was told by her friend that Dr. Lloyd E. Tilbury was treating his wife with some success. The neighbor, at the request of the child's mother, got in touch with the defendant Lloyd E. Tilbury by phone and asked him whether he could cure a case of infection of the bone of a girl about 9 years of age. This neighbor was advised by the doctor to have the child write her name on a piece of paper and bring the specimen of her handwriting to him and that he would advise him if he could cure the plaintiff.

"Dr. Tilbury had for some time prior thereto been diagnosing and treating diseases by a method known as radio treatment. His diagnosis was made by what is called a diagnostic machine, which is briefly described as follows: The mechanism is contained in a box approximately 16 inches long, 12 inches wide and from 4 to 5 inches deep, the top of the box being covered with bakelite. Two dials on the right were for measuring the wave length of the disease. Two dials on the left were for measuring the intensity of the disease. These dials measured from 1–10 and from 10–1000. One dial is set near the center and is used to measure greater intensity from 100–10,000. Another dial near the center is used for turning on the different kingdoms, such as animal, vegetable, mineral, electrical and ether waves, measuring from 1–5. Appellant briefly sets out and describes the contents of the box which, so far as the decision of this case is concerned, need not be gone into.

"With this machine Dr. Tilbury diagnoses diseases in the following manner: From the terminal on the left front of

the machine extends a wire attached to an electrode which is placed over the solar plexus of the patient. The patient's emanation passes through this terminal through the aerial to the kingdom wire and from there to the plate condenser, from whence it passes to the coil condenser on the right of the machine where the wave length of the disease is ascertained. These emanations from the patient passing through the condenser are amplified 3000 times. From the terminal in the front left of the machine extends a wire which is attached to an electrode which is placed over the solar plexus of a healthy individual. Thus emanations from the patient passing through the machine amplified 3000 times are received by this healthy individual. By tuning in on the wave length there is a vibration set up through the sympathetic nervous system of a healthly individual to such a degree that a tenseness will appear over a definite area of the solar plexus of a healthy individual or reagent. In order to ascertain the degree of intensity of the disease Dr. Tilbury used a plain circular rubber rod about eight inches in length and about five-eighths of an inch in diameter, charged with a woolen cloth, and picked up this reaction of the tenseness by passing this rubber rod, which is a negative field, over the tensed area, causing the rod to adhere. Then by turning on the dials to the left of the machine and if necessary the one in the center front, passing the rod over this area until the rod no longer adheres or until the tenseness disappears, and by reading the amount of intensity on the dials, Dr. Tilbury knows how severe the disease is. This method was used for all diseases, keeping in mind each disease as a definite wave length.

"After ascertaining the nature of the disease that the patient is suffering from, Dr. Tilbury treats said disease with a machine known as 'radio method'. This treating machine is briefly described as follows: It consists of a box five inches wide, eight inches long and six inches deep, the top of which is covered with bakelite, to which one dial and four terminal posts are affixed. One post connects with the aerial, one post connects with the ground wire and one post to an electrode which is placed on the occiput of the patient and from the other post a wire extends with multiple electrodes which go to any part of the body which is affected. Inside of the box are multiple coils and other devices which

need not for the purpose of this decision be described herein. The dial on this machine registers from 1–100 and is capable of giving off 550 different wave lengths.

"This machine is used in the following manner: From the terminal to the right extends a wire on which is an electrode that is placed on the occiput or back of the head. From the terminal to the left extends a wire with many terminal branches to which are attached electrodes that are placed over various parts of the diseased areas of the patient's body.

"Immediately after the telephone call by the neighbor of the plaintiff to the doctor he obtained a specimen of the handwriting of Jo Dell Kershaw and brought it to Dr. Tilbury's office. Dr. Tilbury took it and between himself and his wife, Helen L. Tilbury, co-defendant herein, operated certain dials on what Dr. Tilbury described as his diagnostic machine by placing a metal plate on the paper containing the handwriting of the plaintiff, which plate was connected up with the diagnostic machine. Thereupon the defendant Helen L. Tilbury exposed her bare abdomen while the defendant Lloyd E. Tilbury stroked it with his rubber rod and worked the dials on the radio. While the doctor was thus stroking her bare abdomen Mrs. Tilbury explained that she felt a pain in the left leg and hip. Dr. Tilbury then stated to the friend that he had found one condition that required immediate attention and requested him to bring the child in for treatment; that in his opinion an operation was not necessary. About 5 o'clock Mrs. Kershaw took the plaintiff in her arms, as she was unable to walk and in intense pain, and brought her to the office of the defendants, where she was placed upon a settee in the office. There the defendants diagnosed plaintiff's trouble by placing one of the electrodes in the back of plaintiff's neck and a similar electrode on her stomach and on the part of the leg which was affected, all of said electrodes or plates being connected to the little radio box. As Dr. Tilbury turned the dials on the radio box Mrs. Tilbury bared her stomach and Dr. Tilbury rubbed a rubber rod directly over her bare abdomen. As Dr. Tilbury was rubbing the rod over the stomach, Mrs. Tilbury was heard to say: 'Yes, that is the pain in the leg. It is a very bad pain.'

"After this examination Dr. Tilbury stated that plaintiff was very, very ill, but that he could cure her without an operation and that plaintiff would only have to be there a few days; that the child was suffering from meningitis and that instead of settling in her back the germs had settled in her left leg and that in the course of three or four days, or inside of a week, the child would be able to be up and around and would be well and could go home.

"At the time of the examination defendants stated that they were going to use said radio to find out what kind of stupes would be best to apply to the affected parts of the bone and thereupon Mrs. Tilbury went out and obtained a small bottle of vinegar, placing it on the radio with a metal plate thereon, which plate was connected with the radio, and the doctor again rubbed the rubber rod over Mrs. Tilbury's bare abdomen and operated the dials, stating that 'vinegar is fine, we will use hot vinegar stupes for the affected part, for the pain in her leg.'

"At that time the child was placed in the care of defendants and remained there from July 13, 1927, to August 4, 1927, during which time she received the following treatment at the hands of the defendants and their employees: She was given the radio treatment, placed in a vit-o-net or magnetic blanket for approximately 45 minutes and until the patient freely perspired. A few days after this treatment began pus began to discharge from about two inches above the ankle, after which the child was not in such severe pain. In about four or five days after receiving such treatment the defendants prepared to and did leave on their vacation, leaving the patient in the care of one Dr. Peterson, who continued the same method of treating the patient, using the nurse as the subject for rubbing the rod on her bare stomach. Upon inquiry of Dr. Peterson what the child could eat the doctor replied that he would test out food on the radio and find out. The attending nurse brought up some plums, pears, grapes and oranges and placed the metal plate, which was connected with the radio, on each fruit, and Dr. Peterson worked the dials on said radio and rubbed the rod on the stomach of the nurse and stated that the child could eat any of the fruits except the oranges, but that the oranges would not agree with her. Thereafter the child was fed fruits except oranges, and given some broth. The child continued

to have great and intense pain which would become more severe during the nights. After she was in the hospital and before the infection came to a head and broke, the mother remained with the child at night and followed out the treatments the defendants had instructed her to follow, she being instructed to keep up the radio treatments and to apply hot salt stupes on that part of the leg where the child felt the pain. In applying the radio treatments the nurse set the dial, and the plates were placed as hereinbefore described and remained on the child from three to four hours per day. Subsequently the swelling spread from the ankle to the knee, and the left leg appeared to be about twice as large as the other. Upon being informed by Dr. Peterson that the plaintiff's leg was soon going to be well and that it was practically all right, the mother decided to take the child home and attempted to follow the instructions of Dr. Peterson by continuing to apply the hot packs to the child's leg and to give her radio treatments as described by the defendants, but on the second day after the child was taken home she was in such an alarming condition that the mother decided to call in another physician who, after an examination, had X-rays taken and then advised that in his opinion the child's leg could not be saved, suggesting taking her to a bone specialist in order to save her life; that in his opinion the child was suffering from acute osteomyelitis and that she had been suffering from that disease for at least three or four weeks. The child was thereupon taken to the hospital and operated upon by the removal of a portion of the tibia from about three inches below the knee to about two inches above the ankle, which part of the bone was about one-half inch in width and one-eighth inch thick. This operation further consisted of cleaning out as much of the infection as possible by scraping the bone, laying the skin open so that adequate draining was provided and leaving the opening in such a condition as not to interfere with the drainage. Two other operations were necessary for the purpose of opening up collections of pus and providing for adequate drainage for localized infection at the lower end of the wound and it was found necessary that the child have at least one and perhaps two other operations to thoroughly remove all diseased bones and to clear up all infections.

"Let it be understood that the defendant Lloyd E. Tilbury had a license to practice as an osteopathic physician.

██ "Appellants first contend that the trial court erred in overruling the general demurrer to the amended complaint. Those portions of the complaint seriously objected to by them are paragraphs 4, 5 and 7, which are as follows:

" 'IV. That on or about the said 11th day of July, 1927, the said defendants Lloyd E. Tilbury and Helen Tilbury, representing themselves as licensed physicians, did represent to the plaintiffs herein that by a certain process known as a radio treatment, that they could and would cure the minor child of the plaintiff herein from an infection that had set in the bone about two or three inches above her left ankle. That at the said time, the said defendants, Lloyd E. Tilbury and Helen Tilbury did represent to the plaintiff herein and the said minor child, that by reason of said radio treatments, that they could and would within a period of about one week remove the said infection and completely cure the said Jo Dell Kershaw, on account of said infection.

" 'V. That the plaintiff herein relying and believing the said representation of the defendants to be true, did place the minor child, Jo Dell Kershaw, under the care of the said defendants, and that the said minor was placed under the care and custody of the said defendants on or about July 11th, 1927, at a place known and designated as 245 South Oxford Avenue, in the city of Los Angeles, county of Los Angeles, state of California. . . .

" 'VII. That during the time that the said minor, Jo Dell Kershaw, remained under the care and custody of the said defendant, Lloyd E. Tilbury and Helen Tilbury, their agents, servants and employees, that in truth and in fact these said defendants and each of them, and their agents, servants and employees were guilty of gross negligence and malpractice in that the said defendants did not follow or pursue the recognized universal system and standard method of curing the said minor from her said disease, and that they failed and neglected to use and exercise reasonable and ordinary care, diligence and skill in curing the said infection for the following reasons, to wit, that the universal recognized standard system of curing, universally recognized by medical authorities was and should have been the tak-

ing of an X-ray photograph of the said infected bone, and the subsequent scraping or removal of that portion of the bone which would have been revealed as infected and diseased. That had the said defendants followed the said course of treatment which is the universally recognized system and standard method practiced by the medical profession, that the said minor, Jo Dell Kershaw, could and would have fully recovered from her said injuries within about two months and could and would have the full use of her said leg that she enjoyed prior to said infection.'

"It is of prime importance to get the gravamen of the action, which is to be determined by the allegations of the complaint. It can be conceded that the complaint is inartificially drawn, but aside from this, an examination will disclose that Della Kershaw, as the guardian *ad litem* of Jo Dell Kershaw, brought this action against Lloyd E. Tilbury and Helen L. Tilbury; that defendants represented themselves to be physicians and that they could and would cure the said child from an infection that had set in on the bone about two or three inches above the child's left ankle; that plaintiff, believing such representations to be true, placed said child under the care and treatment of the defendants, where she remained from July 13th to August 3d; that the defendants and their agents, servants and employees were guilty of gross negligence and malpractice in that they did not follow or pursue a recognized universal system and standard method of curing the minor of her disease; that they used other and different methods of treatment which caused the infection to spread to the entire front bone of the left leg; that they failed and neglected to use and exercise reasonable and ordinary care, diligence and skill in curing said infection; that said child did not recover under such treatment, but the front bone of said left leg became infected so that on August 13, 1927, said child was operated upon; that as a direct and proximate result of their gross carelessness, recklessness and negligence and by reason of their failure to use ordinary care and diligence in the treatment of said minor child she was continually confined in a hospital from August 13, 1927, to November 25, 1927, and has become and will remain an invalid, and has become a nervous wreck; that she will be a total invalid for two years

and will never have the free and complete use of her left leg and will be permanently disabled for the rest of her natural life.

"There are other matters charged and alleged in the complaint, but we have set out enough of the facts to pass on the demurrer. It will be noted that the complaint alleges the sickness of the daughter; that defendants are physicians; the placing of the child under their care; the treatment and negligence of the defendants, and the damages sustained.

"Appellants contend that because it is alleged in paragraph IV of the complaint that defendants 'did represent to the plaintiffs herein that by a certain process known as "radio treatment" they could and would cure', etc., they were limited to this treatment; that plaintiff's allegation that defendants were negligent in some manner in administering this treatment binds her to a contract and therefore no cause of action is stated. There are many allegations in the complaint which contain statements not pertinent to the issue, all of which were and are only to be treated as allegations of inducement. From the averments of the complaint it appears that the action is one sounding in tort, the gravamen of which is the alleged negligence and unskillful performance of the treatment of the child, and that whatever is alleged therein as to the engagement of the defendants as physicians to treat plaintiff, and as to representations made by defendants regarding the probable effect of said treatment, are to be considered as mere matters of inducement to the main cause of action and not as averments of the breach of a contractual relation forming the basis of the action. This is the holding in *Hall* v. *Steele,* 193 Cal. 602 [226 Pac. 854].

"In the case of *Basler* v. *Sacramento, etc.,* 166 Cal. 33 [134 Pac. 993], the court held that an action based upon the injury, and not upon the agreement of carriage, and allegations of the complaint setting up the contract of carriage must be construed as matters of inducement to show that the person injured was not a trespasser and that by reason of the relation of passenger and carrier a definite duty arose on the part of the latter. This case has been cited with approval many times. (See *Harding* v. *Liberty*

*Hospital Corporation,* 177 Cal. 520 [171 Pac. 98]; *Krebenios* v. *Lindauer,* 175 Cal. 431, 433 [166 Pac. 17]; *Marty* v. *Summers,* 35 Cal. App. 182 [169 Pac. 411].)

"Actions of this kind are not based upon the contract of employment. They sound in tort and are classed as actions *ex delicto* which grow out of the contract. In *Wetzel* v. *Pius,* 78 Cal. App. 104, 106 [248 Pac. 288, 289], a malpractice case, the court said: 'Actions of this character are not based upon contracts of employment; they sound in tort and are classed as actions *ex delicto.* In discussing a similar situation our Supreme Court (*Denning* v. *State,* 123 Cal. 316 [55 Pac. 1000]) said: "The contract of employment has nothing whatever to do with the liability, except to create a duty on the part of the employer, a duty not expressed in the contract, and for the violation of which the contract of employment furnishes no rule or standard for the estimation of damages; nor is the action grounded upon the contract, but the duty springs from the relation created by it, namely, that of employer and employee, and under the old system of pleading was always classed as an action *ex delicto.*" ' (See *Singley* v. *Bigelow,* 108 Cal. App. 436 [291 Pac. 899].) Authorities of other jurisdictions are in accordance with this holding. The demurrer to the complaint was properly overruled.

"The next point raised by appellants is that the attorney for respondent made certain remarks to the jury which tended to prejudice the jury as against appellants. While such remarks were not complimentary to the defendant and probably it would have been just as well if they had not been said, yet the record fails to disclose any objection on the part of the defendant or any request by the defendant to the court to instruct the jury to disregard the same. When circumstances of like character occur during a trial it then becomes the duty of the complaining party to make his objections thereto and ask the court to instruct the jury to disregard the same and a failure to so do will be treated as a waiver of any complaint by reason thereof. (See *Olsen* v. *Standard Oil Co.,* 188 Cal. 20, 26 [204 Pac. 393], and cases there cited.) On the motion for a new trial appellants filed two affidavits asserting that the conduct of the jury prevented them from having a fair

trial. Such misconduct consisted in one of the jurors falling asleep and continuing to sleep for several minutes during the trial. If one of the jurors fell asleep during the trial and it was noticed by appellant, it then became his duty to so notify his attorney who should call the court's attention thereto, and his failure to do so must be deemed a waiver of the objection. It does not behoove a litigant to observe an error being committed and sit idly by and not mention it to his attorney or the court. Should he do this he puts himself in the position of saying: 'If I win I will say nothing; if I lose I will raise the error.' This is not fair to the court and the litigant should not be permitted to take advantage thereof. (*Carey* v. *Gunnison*, (Iowa) 17 N. W. 881.) Such error, if any, has been waived and merits no further consideration.

■ "It is next objected that the trial court erred in over-ruling appellants' objection to certain testimony consisting of hypothetical questions offered by plaintiff. In stating a hypothetical question the better rule is that it must conform to the testimony. Where the witness answers a question which is not founded on all of the facts of the case the answer goes to the weight of the witness' evidence rather than to its competency and materiality. (*Reardon* v. *Richmond Land Co.*, 21 Cal. App. 357 [131 Pac. 894]; *McCullom* v. *Barr*, 38 Cal. App. 411, 428 [176 Pac. 463]; *Perkins* v. *Sunset Telephone & Telegraph Co.*, 155 Cal. 712 [103 Pac. 190].)

■ "The appellants contend that the witnesses, offered as experts, were not qualified as such to answer the hypothetical questions as to the proper methods of treatment, not using these methods themselves, and knowing nothing concerning them. The appellant Lloyd E. Tilbury testified that he was an osteopathic physician and that he had perfected what he termed a diagnostic machine which he used for the purpose of diagnosing the patient's illness. After ascertaining the nature of the disease his patient was suffering from, he would treat the disease with another machine known to him as the 'radio method'. Such machines were only known to Dr. Tilbury and were his own invention not in general use, nor accepted by any of the schools of medical practice or drugless healing. The qualifying questions were sufficient to establish the competency of the several medical

doctors offered as witnesses by the plaintiff by reason of the fact that their education and experience was such as to qualify them to testify as expert allopathic physicians and surgeons. The basis of the objection to their competency as witnesses concerning the method of treatment as administered by Dr. Tilbury goes to the treatment of respondent's ailment by appellants' radio methods, about which they testified they knew nothing, such methods not being recognized by the allopathic school of medicine.

"These objections to the testimony went to the weight, rather than to the competency of the evidence. Simply because a person claims to have some new process or method of healing peculiar to himself is no reason why other persons who do not claim such process or method are not, from education and practice, competent to judge whether the treatment administered was negligently or carelessly done. If we should hold otherwise, it would open the door to all sorts of nonprofessional persons who would undertake to treat all kinds of diseases and disorders, and no evidence could be brought to establish the negligence of such treatment. The practitioner, knowing that no such person could be found to testify against him with regard to such negligence, the injured person would be without remedy, and this cannot be the law. This view is also expressed in *Longan* v. *Weltmer*, 180 Mo. 322 [103 Am. St. Rep. 573, 64 L. R. A. 969, 79 S. W. 655]. The value of an opinion of an expert witness depends on his intelligence, knowledge and experience and his testimony is a guidance for the jury. What weight, if any, they will give to such testimony is entirely with them.

"Dr. Diebold, who qualified as an osteopathic physician, testified that the methods used by the defendant were unknown to the practice of osteopathy and that a physician who did use such methods did not use ordinary care and diligence. This, like the answers of the allopathic testimony, went to the weight of the evidence, rather than to its competency, and it was for the jury to decide whose testimony they would rely upon. We might go one step farther and say that the opinion of an expert that the treatment must have been improper, based on the result of recovery, is evidence on which the jury may find negligence. (*Sawyer* v.

*Berthold,* 116 Minn. 441 [134 N. W. 120] ; *Reardon* v. *Richmond etc.,* 21 Cal. App. 357, 359 [131 Pac. 894].)

"Much stress is laid to the fact that the form of the questions was such as to usurp the prerogative of the court and the jury as to negligence. In answering defendants' contention, it must be understood that the defendants were not treating the plaintiff by the methods of the osteopathic school of treatment, but by the 'radio method', a method of Dr. Tilbury's invention, a method of an unknown quantity.

When one, with his own inventions, holds himself out as a healer of diseases and accepts employment as such, he must be held to the duty of reasonable skill in the practice of his profession, and when he seeks fields of experimentation he will be held accountable for any damages proximately caused by the unskillful treatment of his patients.

"This court passes no judgment on the theory of his profession, the source from whence it came, nor the appliances with which he works. With these we have no concern, but rather look to the results. The law holds him responsible if he does his work unskillfully, although he does the best he can. He assumes the risk of the quality and accuracy of his genius or inventions. On the same principle one who holds himself out as a medical expert and accepts employment as a healer of diseases, but who relies for diagnosis and remedies on some mechanical invention of his own, which invention is unknown to all schools of medical science, in like manner takes the risk of the quality and accuracy of such mechanical invention. If these move so imperfectly or inaccurately that he fails to treat the patients with reasonable skill, he is liable for the consequences. The law takes cognizance of the question: Did the practitioner render the services he undertook in a reasonable manner? That question as applied to the appellant Lloyd E. Tilbury, the jury, on sufficient proofs, we believe, have answered in the negative.

"While it is true that the physicans who testified on the part of the plaintiff did not claim or pretend to know anything about the practice of the 'radio method', they were nevertheless competent, from education and experience, to testify as to whether the treatment which plaintiff underwent was proper. Simply because a person claims, or pretends to have invented a machine for diagnostic and curative purposes which is not known or recognized by any school of

medical science, which machine possesses certain powers of healing peculiarly within the knowledge of the inventor, is no reason why other persons who know nothing of the workings of such machine but who have knowledge acquired from education, experience and practice, are not competent to judge whether the treatment administered is negligently or carelessly done. Otherwise as we have heretofore indicated, any nonprofessional person might undertake to treat certain disorders, and if appellant's position be correct in law, it matters not how carelessly or negligently his acts were performed, because no one could be obtained of the same pretensions to testify with respect to such treatment and the injured person would be without remedy. This contention we think untenable and has been so held by other jurisdictions.

■ "It is claimed by defendant that the court erred in rendering judgment against the defendant Helen L. Tilbury, wife of defendant Lloyd E. Tilbury. The testimony discloses that she is not a physician; that she was not employed to care for the sick child and that she never prescribed or treated respondent's child. The evidence does disclose that her relations with the subject matter were in the nature of assisting her husband in making the diagnosis and in the treatment. She acted more in the capacity of a nurse, under her husband's instructions. Respondents claim that because the evidence discloses that she was a part owner in the business and hospital operated by both defendants, she is liable. There are no allegations in the complaint of any damages arising from the hospital services. The suit is one of malpractice and not based on hospitalization. The business itself could hold no license nor be permitted to practice the medical profession. We recognize the law to be that anyone who holds himself out as a physician, whether one or not, is liable for his tortious acts, but in the instant case nothing of the kind was done by the appellant Helen L. Tilbury. In this case Helen L. Tilbury was nothing more than an assistant to the appellant Lloyd E. Tilbury in the practice of his profession, and we are of the opinion that she, not being made a party by reason of any allegations as to being his assistant or employee, and the case being for malpractice, the judgment should be reversed as to her."

■ In considering the claim of excessive damages we have carefully examined the record, which shows that plaintiff has undergone great suffering. Nevertheless, we think that taking all of the circumstances together the award of $30,000 damages is clearly excessive, and appears to be based upon the shortcomings of defendant rather than the actual injuries sustained by plaintiff. She contracted the disease before she consulted him, and his treatment at most delayed her recovery, and perhaps aggravated her condition, besides causing her unnecessary pain and suffering during the period of his futile efforts. In this state of the record, we are forced to conclude that passion and prejudice entered into the determination of this award. It is our opinion that a reduction of said award is necessary, and that the sum of $20,000 is the maximum that can be justified under the evidence before us.

The judgment against Helen L. Tilbury is reversed. The judgment against Lloyd E. Tilbury is modified by reducing the amount thereof to the sum of $20,000, and as so modified the judgment is affirmed.

Rehearing denied.