[Civ. No. 13459.   Second Dist., Div. One.   June 30, 1942.]

DOREEN MIRICH, a Minor, etc., Respondent, v. W. E. BALSINGER, Appellant.

A. Brigham Rose for Appellant. .

Phillip W. Silver for Respondent.

WHITE, J.—Plaintiff instituted this action against defendant, a plastic surgeon, to recover damages for alleged malpractice. Trial before the court sitting without a jury resulted in a judgment for plaintiff. A motion for a new trial was denied. From the judgment and the order denying the motion for a new trial this appeal is prosecuted by the defendant doctor.

By her complaint plaintiff alleged that the defendant held himself out to the general public as a physician who specialized in plastic surgery; that he further represented to plaintiff, a minor, and to her mother, that he could beautify and improve the appearance of plaintiff's nose by performing certain nasal plastic surgery thereon; that the defendant was employed to perform this plastic surgery, and that pursuant to such employment he did on July 13, 1939, perform a plastic operation upon plaintiff's nose. The complaint further alleged that this operation was performed so negligently and carelessly that following such operation the nostrils of plaintiff's nose commenced to "shrink together," thereby making it impossible for plaintiff to breathe at all through her nose. It was further alleged that on February 5, 1940, defendant performed a second operation upon plaintiff's nose in an attempt to correct the shrinkage of the nostrils; that following the second operation, however, plaintiff's nostrils again "shrank together," obstructing practically in its entirety any breathing through the nostrils. The pleading further charged upon information and belief that the defendant in the first operation negligently and carelessly cut out unnecessarily from the nasal passages an excessive amount of tissue and did carelessly, negligently and unnecessarily cut out a part of the lining membrane, all of which caused a complete and permanent shrinkage of the frontal nasal passages.

In her complaint plaintiff further alleged that because of the negligence and carelessness of defendant she was com-

pelled to suffer unnecessarily the pain and anguish of being required to have two tubes in her nostrils; that she likewise suffered various complications, and is informed and believes that it will be necessary for her to submit herself to several further operations, including a grafting process, to cure the condition.

By his answer the defendant denied that he made any representations to plaintiff or her mother; admitted that he was employed to perform plastic surgery upon the plaintiff; that he did perform the operations set forth in plaintiff's complaint; but denied that he was guilty of any of the negligence charged in the complaint. By way of affirmative defense plaintiff's answer alleged that the defendant gave the plaintiff certain instructions, the observance of which was essential and necessary to effect a proper recovery, but that plaintiff negligently, carelessly and willfully refused and failed to follow or adhere to such instructions, and that any injury sustained by plaintiff was the proximate result of her own negligence, carelessness and wrongful conduct.

The trial court found that all the allegations of plaintiff's complaint were true, save and except as to the amount of damages allegedly sustained by her. It was further found that the denials and affirmative defense set forth in defendant's answer were not sustained by the evidence. The court expressly found "that said defendant in the first operation, previously mentioned, negligently and carelessly did cut out unnecessarily from the nasal passages an excessive amount of tissue and did carelessly and negligently and unnecessarily cut out a part of the lining membrane, all of which caused a complete and permanent shrinkage of the frontal nasal passages."

We find in the record evidence given by the minor plaintiff that on July 10, 1939, defendant doctor stated to her and her mother that he could make plaintiff's nose smaller, the tip narrower, and also make her nostrils larger, and further, that when he performed the operation he would also correct the difficulty in breathing from which the plaintiff suffered; that the operation was performed July 13, 1939, following which the nose was packed, tubes were inserted, and a cast placed on it. With reference to certain instructions given her by defendant doctor, plaintiff testified that she rigidly adhered thereto. She further testified that at the expiration of six weeks after the operation, during which

time she had visited the doctor at various intervals, she first observed an unusual condition about her nose, in that "it became pinched at the tip. The nostrils became very small. The nose was crooked and appeared to be brought over to one side"; that the defendant informed plaintiff that when he returned from Chicago he would perform a second operation to correct the existing condition; that such operation was performed by defendant, and that prior thereto plaintiff's nostrils were "practically closed up." She also testified that following the second operation she was required by defendant doctor to have certain tubes inserted in her nostrils, which tubes were removed at the expiration of three weeks, after which the nostrils became very small. She testified that on each occasion when the defendant removed the tubes from her nostrils the latter would again become small. She gave further testimony as to the pain and suffering she endured when the tubes were inserted in the shrunken nostrils; that in April following the operation, when the tubes were removed for the last time, the nostrils became small again and practically closed on the right side, with a small opening on the left; that the defendant agreed to perform a cauterization upon the plaintiff, pursuant to which agreement he again operated on her nose and opened her nostrils. Thereafter defendant instructed plaintiff to obtain X-ray treatments, which she did, receiving four such treatments. Following the last X-ray treatment, the tubes were removed by defendant from plaintiff's nose and it began to shrink again. Thereupon defendant informed her that the X-ray doctor either had not given her enough X-ray treatments or had not given her the right kind of such treatments. Thereupon defendant stated to plaintiff that the only thing he could do was to operate again and for her again to take X-ray treatments; but plaintiff refused to submit to a fourth operation. Her testimony showed further that after the last X-ray treatment she was able to breathe only through the left side of her nose, but not enough to breathe comfortably, and that this condition became increasingly worse. At the date of the trial plaintiff's nostrils were "all closed up."

Defendant doctor testified in his own behalf that the minor plaintiff's mother brought her to him in regard to correcting the shape of the daughter's nose and with reference to the possible curing of her impaired breathing, which was due to a deflection of the septum. Defendant testified that he in-

formed the mother that he thought the shape of the nose could be corrected. The witness then described in detail how he performed the first operation. As to the second operation, the doctor testified that in the performance thereof he cut between a sixteenth and a thirty-second of an inch of skin on each side of the nose. The third operation, he testified, was performed to dissect the scar tissue and thereby release the lateral walls of the nostrils.

It was conceded by both parties that the accumulation of excessive scar tissue was what caused the contraction of the lateral walls of the nostrils. It was the contention of the plaintiff, however, that this excessive accumulation of scar tissue was brought about by the negligence and carelessness of defendant doctor in cutting out unnecessarily from the nasal passages an excessive amount of tissue and part of the lining membrane, resulting in a complete and permanent shrinkage of the frontal nasal passages; while the defendant, as appears from his testimony, attributed the condition which developed in the plaintiff's nose—called an atresia—to the fact, as he said, that "the patient had an inherent condition of scar tissue formation," which he defined as "an inherent characteristic of certain persons to production of scar tissue." In answer to a question as to whether such a tendency on the part of plaintiff to produce scar tissue would not have manifested itself after the first operation as well as after the second and third, defendant doctor testified: "That is not true in experience at all. I have operated various times for, say, a face lift, surface cutting, and the patient does not always react the same at any two different times. You may have a scar at one time and dissect that out in another operation, getting perfect results. Or you may have it vice versa, you may have a good result one time and next time you operate the same patient and you may have scar tissue form."

There appears to be no conflict in the evidence to the effect that an atresia of the nose following Rhino plastic surgery is attributable in the main to one of the following causes: (1) loss or absence of the vestibular lining (which the plaintiff maintains was the reason for the condition in her case); (2) infection; (3) presence of a syphilitic condition or occasionally following cases of smallpox. In the instant case it is also conceded that neither infection nor any of the diseases responsible for atresia was present.

Dr. William S. Kiskadden, a plastic surgeon produced as

a witness by the plaintiff, testified that he examined her in August, 1940, at which time she was suffering from what was commonly termed an atresia and occlusion of the nostrils; that operative work would have to be undertaken to correct this condition. It was his opinion that the scar tissue which he felt was causing this occlusion would have to be cut away and new tissue grafted into place to supplant the scar tissue that had presumably formed; that two or more operations would be necessary in this case. In answer to a hypothetical question, this witness testified that in his opinion the atresia probably was due to the fact that some of the lining membrane of the nose had been lost or did not exist. Dr. Harold M. Holden, a plastic surgeon testifying on behalf of the plaintiff, stated that he examined her in July, 1940, at which time she was suffering from atresia of both nostrils. In response to a hypothetical question which covered the various operations performed upon plaintiff by defendant and the results thereof, this witness gave it as his opinion that the only thing that would create an atresia would be the removal or destruction of part of the vestibular lining of the nostril. He further stated that in his opinion the hypothetical surgeon who had performed the operation mentioned in the question, in cutting out the amount of tissue that he did, had not exercised that degree of skill and care required of a plastic surgeon specializing in plastic surgery, measured by the standard of skill and care ordinarily possessed and exercised by a reasonably prudent and skillful plastic surgeon specializing in plastic surgery in the community in which the operation was performed.

Dr. Saul S. Robinson, a witness produced by the plaintiff, testified that he specialized in dermatology; that on June 13, 1940, he saw the plaintiff at his office, at which time her nostrils were open; that he administered to her four X-ray treatments, which he considered sufficient, because of the possibility that a greater number might result in X-ray burn. Another physician and surgeon, Dr. Sol Malis, called on behalf of the plaintiff, testified that he met her professionally on August 19, 1940. In answer to a hypothetical question propounded to him, this witness testified that in his opinion the cause of the atresia was the accumulation of scar tissue. Assuming as he did in answering the hypothetical question, that the atresia was occasioned by the removal of excessive tissue from the nose, he gave it as his opinion that due care

was not exercised by the surgeon who performed that operation in cutting out the amount of tissue that he did, when measured by the standard of skill and care ordinarily exercised by a reasonably prudent and skillful surgeon practicing in the same community. This witness based his opinion on the history of the case, the operation, the formation of an atresia, coupled with the bi-laterality of the atresia formation, which he stated was "very important." When asked why, he answered, "Things may happen in surgery by the most skillful men from time to time. That the same thing should happen on both sides and to about the same degree, I came to the conclusion it was not one of accident, but one of negligence." In the opinion of this witness, scar tissue would form six weeks to three months after such an operation if proper technique is not followed in the excision of tissue. In addition to the reasons heretofore given, the witness also based his opinion in answer to a hypothetical question upon the results that ensued from the operation as well as because of the elimination of the heretofore narrated other causes of atresia.

The defendant produced as a witness Dr. Joseph Ginsberg, who testified that he had examined the plaintiff some months before the giving of his testimony. He testified that at the time of his examination there existed a total occlusion of both nostrils. It was his opinion that there was nothing the operating doctor could do to control the type of scar tissue development that manifested itself in this case. He said, "That no one can determine, and very often scars that look very lovely after the patient is dismissed after appendectomies and plastic operations suddenly become hypertrophic, large, broad, after two or three months have passed." This witness further testified that the growth of scar tissue was due to the incision and the patient's reaction to such incision.

Dr. Samuel Ayres, Jr., testifying as an expert witness on behalf of the defendant, gave it as his opinion that there was no way in which a physician situated as was the defendant in this case could determine in advance whether the scar tissue resulting from the operation would be hypertrophic or large in accumulation. Similar testimony was given by another physician who qualified as an expert.

Dr. Edward H. McManus, testifying on behalf of the defendant, in answer to a hypothetical question based upon the technique of the operation performed in the instant case,

stated that he was of the opinion that the defendant doctor herein exhibited and exercised the required skill and care ordinarily possessed and exercised by the average reputable surgeon practicing plastic surgery in the city of Los Angeles under the same or similar conditions. He further testified that the growth of fibrous or scar tissue is beyond the control of the operating physician, and, as he said, "You may do the most beautiful work, the patient may be pleased, and six or eight weeks after the operation they may come to your office with the most terrific scars you have ever witnessed." He gave it as his opinion that some people develop scar tissue and others do not, and referring to the plaintiff in the instant case, said, "This young lady evidently is prone to develop scar tissue." It was also the opinion of this witness that the removal of the lining membrane of the nose will not cause an atresia.

Appellant first challenges the sufficiency of the complaint on the ground that it cannot be ascertained from such pleading whether plaintiff is suing because of (1) breach of warranty to beautify her; (2) negligence in the performance of a contract to beautify her; (3) negligence in the performance of the first operation; or (4) negligence in connection with the second operation. The claim of uncertainty cannot be sustained. The complaint specifically alleged negligence in the performance of the first operation. These averments clearly established the cause of action as one sounding in tort, the gist of which is the alleged carelessness and negligence of the surgeon in the performance of the operation. Other allegations as to the engagement of defendant physician to perform the operation and representations allegedly made by him as to the probable outcome of the operation as well as the effect thereof upon the plaintiff's features, are to be considered as mere matters of inducement to the main cause of action and not as allegations charging a breach of a contractual obligation. (*Hall* v. *Steele*, 193 Cal. 602 [226 Pac. 854]; *Harding* v. *Liberty Hospital Corp.*, 177 Cal. 520 [171 Pac. 98]; *Marty* v. *Somers*, 35 Cal. App. 182 [169 Pac. 411]; *Kershaw* v. *Tilbury*, 214 Cal. 679 [8 P. (2d) 109]; *Wetzel* v. *Pius*, 78 Cal. App. 104 [248 Pac. 288].) Equally without merit is appellant's contention that because certain acts of negligence are alleged upon information or belief, the pleading is insufficient. The only source open to plaintiff in ascertaining the causes which produced her ailment and

condition that allegedly followed the operation was medical advice from other physicians consulted by her. In any event, pleadings are meant to be self-serving, and basing them upon hearsay is expressly authorized. (*Davis* v. *City of San Diego,* 33 Cal. App. (2d) 190, 193 [91 P. (2d) 640].)

■ Appellant next urges as a ground of reversal that there is no substantial evidence in the record to sustain and support the trial court's findings that the defendant negligently and carelessly cut unnecessarily from the nasal passages of the plaintiff's nose an excessive amount of tissue, and did carelessly, negligently and unnecessarily cut out part of the lining membrane, all of which caused a complete and permanent shrinkage of the frontal nasal passages of plaintiff's nose. In this regard it is contended by appellant that at most the evidence merely established a post-operation result which does not ordinarily occur, but that its occurrence in the instant case was not shown by the evidence to have been the result of any negligence. We are not unmindful of the fact that the difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results, and that all the law demands is that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in his locality, and that he use reasonable and ordinary care and diligence in treating the patient. Whether the professional conduct of a physician in a particular case measures up to the required standards is a question for experts and can be established only by their testimony; but where, as here, the expert testimony in relation thereto is in conflict, it is primarily for the triers of fact to resolve if possible such conflict in favor of or against the physician. Whenever the conclusion arrived at by the trial court is supported by substantial evidence, contradicted or uncontradicted, an appellate tribunal is without authority to interfere therewith, even though it may appear to the reviewing court that the evidence would justify a contrary finding and conclusion. (*Hall* v. *Kaufman,* 37 Cal. App. (2d) 264 [99 P. (2d) 339]; *Raggio* v. *Mallory,* 10 Cal. (2d) 723, 725 [76 P. (2d) 660]; *Boens* v. *Bennett,* 20 Cal. App. (2d) 477, 483 [67 P. (2d) 715].)

We have heretofore set forth the evidence given by expert witnesses in answer to hypothetical questions based upon the evidence adduced. The trial court, as indicated by its findings, chose to believe and adopt the testimony given by expert

witnesses adverse to the defendant's theory and contentions. We therefore cannot disturb the conclusion arrived at, because it is not our function to determine the credibility of witnesses nor to evaluate their testimony. (*Kiernan* v. *Herbert M. Baruch Corp.*, 20 Cal. App (2d) 289 [66 P. (2d) 748].) What we have just said does no violence to the views expressed by us in *Adams* v. *Boyce*, 37 Cal. App. (2d) 541 [99 P. (2d) 1044], cited by appellant. ■ It must also be remembered that in malpractice cases it is not necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence of the physician resulted in the injury to the patient. Were such the rule, it would rarely be possible to recover in a case of negligence in the practice of a profession which admittedly is not an exact science. It is therefore not required in the trial of such cases that the negligence of the defendant as the proximate cause of the injury be established with such absolute certainty that any other conclusion is excluded. Substantial evidence which reasonably supports the judgment is sufficient. (*Dimock* v. *Miller*, 202 Cal. 668, 671 [262 Pac. 311].)

■ Appellant's contention that the court erred in determining that Drs. Holden and Malis possessed the qualifications necessary to entitle them to express their opinions as to the cause of plaintiff's ultimate conditon and as to whether defendant doctor had exercised the proper and requisite degree of skill and care, cannot be upheld. ■ It is for the trial court to determine, in the exercise of a sound discretion, the competency of an expert witness to give his opinion in evidence. (*Fairbank* v. *Hughson*, 58 Cal. 314.) The determination of the competency of a witness to testify as an expert is in itself in the nature of a trial of a question of fact addressed to the judge alone, and as in other decisions on questions of fact by a trial judge, his ruling thereon, being a matter of discretion, will not be overturned on appeal save and except when there is an actual want of evidence to support it or a clear abuse of discretion in ruling upon the evidence proffered upon the subject. When there is any substantial evidence to support the ruling of the trial judge, it will be upheld.

■ Dr. Holden testified that he was a plastic surgeon, specializing in plastic surgery, licensed to practice in the State of California, and that he had a certificate from the American Board of Otolaryngology, which certificate recognized him as a specialist in his profession. He testified that he had degrees

of Doctor of Dental Surgery, Master of Arts, Doctor of Philosophy and Doctor of Medicine; that he was connected with Cedars of Lebanon, Hollywood, and St. Vincent's Hospitals; that he first began to practice in Tampa, Florida; that he practiced continuously in Illinois for ten years and in Los Angeles continuously from 1938 to 1939; that he had performed upwards of three thousand operations. While on the Pacific Coast he had performed about four hundred plastic operations; that he had observed two other plastic surgeons in Los Angeles at work; that his knowledge of what the average surgeon practicing plastic surgery in Los Angeles does is based upon what he does himself and upon what he observed these other two physicians do.

█ Concerning the qualifications of Dr. Malis, he testified that he was a physician and surgeon, first admitted to practice medicine in 1924, and that he specialized in otolaryngology (ear, nose and throat); that he was a graduate of the University of Manitoba, Canada; that he was connected with Cedars of Lebanon Hospital, Queen of Angels Hospital, Mt. Sinai Hospital, Lincoln Hospital, French Hospital and the County Hospital. That he was recognized by the American Board of Otolaryngology by examination which took place in 1929 and again in 1931. That the American Board of Otolaryngology was composed of men picked from the nation, recognized of years standing, teachers and professors, and that this board meets once in two years to examine candidates for this specialty; that he had been so examined and accepted in 1929 and in Los Angeles in 1930, and ever since then had been recognized as a specialist in the treatment of diseases of the nose. That after he arrived in the United States he did post-graduate work at Columbia University and the New York Post-Graduate Hospital. Following that post-graduate work he was a resident surgeon in Newark Eye and Ear Infirmary for one year in 1929. That he had been doing surgery for sixteen years; that most of his cases were intra-nasal surgery. He testified that he had made a study of the causes of atresia of the nose; that he had seen many cases of atresia; that he had kept up with medical science and learning; that he had undertaken a course in plastic surgery under Professor Vincent Shehan, who was a national authority on plastic surgery. The evidence just recited clearly demonstrates that there was no abuse of discretion in the ruling of the trial judge permitting the witness in question to testify,

and we are therefore without authority to disturb such ruling. (*Johnson* v. *Western Air Express Corp.*, 45 Cal. App. (2d) 614, 630, 631 [114 P. (2d) 688].) The qualifications of another expert witness produced by respondent remain unchallenged by appellant.

An issue is also made by appellant of the fact that no negligence was charged in connection with the second and third operations, and further, that the medical experts who testified at the trial had not made an examination of the plaintiff until over one year after the first operation. Allegations of negligence in regard to the second and third operations were unnecessary, as the evidence reveals that the atresia came into existence after the first operation and before the second, and that all operations after the first were to correct a continuing condition of atresia. If the defendant was shown to have negligently performed the first operation and thereby brought about the condition complained of, it is manifest that further negligence need not be pleaded as to the subsequent operations. Nor does the fact that plaintiff did not consult another physician until a year had elapsed from the time of the first operation impair her cause of action. The fact that she had confidence in the defendant and continued under his care during this period of time without consulting another physician cannot excuse him in any way. Obviously, expert testimony of a physician who examined the plaintiff soon after the first operation was to be desired; however, the testimony of the expert witnesses who examined the plaintiff one year afterward, when her condition was a continuing one, was the best evidence possible under the circumstances and adequate for the purpose. Any other ruling would penalize the plaintiff for her faith in the defendant and place him in an advantageous position to which he is not entitled. In an analogous situation in the case of *Trombley* v. *Kolts*, 29 Cal. App. (2d) 699 [85 P. (2d) 541], this court held that where the evidence showed that the relation of physician and patient continued until about four months prior to the commencement of the action, there was a continuing obligation on the part of the physician to treat the patient in a proper manner, and the statute of limitations did not begin to run until the termination of the relation of physician and patient.

Finally, appellant insists that the trial court committed prejudicial error in overruling objections made to the form

and contents of the hypothetical questions propounded to certain expert witnesses produced at the trial by respondent. In support of this claim it is urged that in propounding the hypothetical questions to Drs. Holden and Malis, the operative technique testified to by appellant doctor as having been used by him was ignored, and that conjectural factors selected by respondent's counsel and not included in the evidence was incorporated in the questions. We have painstakingly read the long hypothetical questions and their repetition here would unduly prolong this opinion; but we are persuaded that appellant's claim is without merit. Taking into consideration the testimony given by appellant doctor on the witness stand and in his deposition which was received in evidence, we are convinced that every hypothesis contained in the questions had some evidence to sustain it. The questions certainly were neither unfair nor misleading. In propounding a hypothetical question, counsel has a right to frame it upon the theory of the questioning party and in accordance with the facts fairly deducible from the evidence. The question need not include a statement of all the evidence in the case. (*Coyne* v. *Pacific Mutual Life Ins. Co.*, 8 Cal. App. (2d) 104, 111, 112 [47 P. (2d) 1079].) That an opinion is not founded upon all the facts of the case goes to the weight of such evidence and not to its competency or materiality. (*McCollum* v. *Barr*, 38 Cal. App. 411 [176 Pac. 463] ; *Reardon* v. *Richmond Land Co.*, 21 Cal. App. 357 [131 Pac. 894] ; 10 Cal. Jur. 966, § 223.) ▮ Nor does the fact that the opinion of an expert that the treatments of the physician were improper is based upon the result of recovery deprive the court or jury of the right to predicate a finding of negligence upon such expert testimony. (*Kershaw* v. *Tilbury, supra,* p. 692.) Certainly no prejudice resulted to appellant from the form or contents of the hypothetical questions.

▮ Appellant next challenges the qualifications of Dr. Malis and the admissibility of his opinion, for the asserted reason that the witness was not a plastic surgeon. Our attention is not directed to any rule, nor do we know of any, which militates against a physician trained in one school of medicine from testifying in a proper case concerning a treatment by a physician and surgeon trained in a different school. While such objection might be made in a malpractice case where the charges of negligence were directed against some

special course of treatment to be tested by the teachings and doctrines of a particular school, it can have no applicability to a case like the instant one, where the general charges of negligence relate to matters within the knowledge and observation of every physician and surgeon, particularly so, where, as here, the witness testified that he had made a study of the causes of atresia; that he had seen many cases of it; that he had kept up on medical science and learning; that he had undertaken a course of plastic surgery under Professor Vincent Shehan, a national authority on the subject; and that he had watched various plastic surgeons work, including Drs. Smith, Kiskadden, Updegraff, Holden and Ginsberg. Manifestly, the court was guilty of no abuse of discretion in permitting this witness to answer the hypothetical question propounded to him covering the standard of care exercised by the hypothetical plastic surgeon referred to in the question and giving his opinion as to the cause of the atresia from which the plaintiff was suffering. (*Abos* v. *Martyn,* 31 Cal. App. (2d) 705, 713 [88 P. (2d) 797]; *Ellinwood* v. *McCoy,* 8 Cal. App. (2d) 590, 593 [47 P. (2d) 796]; *Hutter* v. *Hommel,* 213 Cal. 677, 681 [3 P. (2d) 554].)

The attempted appeal from the order denying the motion for a new trial is dismissed.

For the reasons herein stated, the judgment is affirmed.

York, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 27, 1942.