[Civ. No. 15670.   First Dist., Div. One.   Aug. 21, 1953.]

Estate of CHARLES FRANKLIN GORE, Deceased.   VIRGINIA GORE DENTON, Appellant, v. JOHN L. GARAVENTA, as Executor, et al., Respondents.

William B. Chaplin, Edwards & Friborg and R. Donald Chapman for Appellant.

W. Blair Rixon, Tinning & DeLap and J. Vance Porlier for Respondents.

WOOD (Fred B.), J.—The sole question upon this appeal by the petitioner for revocation of the probate of a will is whether or not the opinion of a licensed physician and surgeon (an eye, ear, nose and throat specialist) concerning the sanity of the decedent was properly admitted in evidence.

The qualifying questions developed the following facts. The witness, Dr. Lowenstein, is a licensed physician and surgeon in this state. He took his medical training at the University of Vienna, graduating with the degree of medicine in 1937; came to this country in June, 1938, and took medical work here; was in Chicago for a short time; came to San Francisco and interned at the city and county hospital during 1938 and 1939; was with the Green's Eye Hospital, San Francisco, for about three years; then practiced in Richmond, California, for a while, doing eye, ear, nose and throat at the shipyard; since then he has been practicing in Pittsburg; limits his practice to eye, ear, nose and throat almost exclusively.

He saw the decedent once, for about 30 minutes, on April 11, 1949, four days after the execution of the will. Decedent came to his office for an examination for his civil aeronautics license, and wanted some glasses. He gave decedent a "complete examination, the long form, blue sheet, and all kinds of questions on there." He said, "I did a complete eye examina-

tion with the Green's eye refractor and I checked his eyes, ears, nose and throat. I checked him over completely. As a matter of fact I checked—I remember I put it down here. I checked him. I even checked his urine, and it was negative. There was nothing wrong.''

Respondent then asked him, ''during the period of approximately 30 minutes that you had Mr. Gore [the decedent] under your observation, and during the course of your examination, would you express an opinion as to whether he was sane or insane?'' Appellant objected, saying ''He hasn't qualified him as an expert for one thing.'' The court remarked that it is not necessary to qualify ''with acquaintances.'' Appellant stated, ''I know, but in acquaintances they must be intimate acquaintances.'' The court remarked that it goes to the weight of the testimony and appellant renewed her objection: ''I don't think he is even qualified to answer the question, to have the question put in. There is no background for it. I object to it on that ground. This man never saw him but once.'' The court then overruled the objection and directed the witness to answer.

The doctor answered, ''To me he was absolutely sane, just as sane as I am.''

Upon cross-examination, asked if, without looking at his records, he recalled what he did that day with Mr. Gore, the doctor said, ''Certainly, I do. I did the usual examination. I put him before the Green refractor. I asked him questions, —is it better this way, or better that way, or that with the lens before his eyes?'' Continuing, he said ''I set him in a chair. I put lenses before his eyes. I asked him if he could see better now, or put some other lens in front of his eyes, I asked him, 'Does that help you, or does it make it worse.' He seemed to answer me. I have the exact record even the axis of the ceiling which he couldn't answer unless he were able to understand what I am asking him.'' Decedent's ability to answer was not the only reason for the doctor's opinion, ''the man appeared to me to be sane, that's all I can say.'' The examination was of the eyes, ears, nose and throat, ''and the physical examination following the blue sheet [about 10″ x 12″] on the civil aeronautics examination form.'' Asked if he was a psychiatrist or an neurologist, the doctor said, ''No, I am an M.D. That's all the classification I have.'' Upon redirect, the doctor said he found nothing wrong with Mr. Gore except that he had far sighted astigmatism.

■ It appears to us that the witness was qualified to give his opinion as a physician and surgeon, one who had the opportunity to observe which this evidence discloses; not as an "intimate acquaintance" of the decedent. ■ "An utter stranger does not ordinarily become the intimate acquaintance of another within less than twenty-four hours after their first meeting." (*Estate of Relph*, 192 Cal. 451, 463 [221 P. 361].) ■ We need not necessarily infer, from the remarks of the court made before counsel restated his objection, that the court admitted the doctor's testimony solely as that of an intimate acquaintance. Even if the trial court did so, it is immaterial because the testimony was admissible as that of an expert. ■ It is judicial action, not judicial reasoning, which is reviewable. (See 4 Cal.Jur.2d 390-392, Appeal and Error, §§ 536-538.)

■ The opinion of a witness "on a question of science, art, or trade, when he is skilled therein" may be given in evidence. (Code Civ. Proc., § 1870, subd. 9.) This commits to the trial court, in each case, the determination of the issue whether or not the witness on the stand is "skilled" in the "science, art, or trade" to which the question asked of him relates. ■ As said by Wigmore, the competency of an expert "is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement." (Evidence, 3d ed., § 555, p. 634; quoted in *Sinz* v. *Owens*, 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; and in *Huffman* v. *Lindquist*, 37 Cal.2d 465, 476-477 [234 P.2d 34].)

■ Where the subject matter of an opinion relates "to matters within the knowledge and observation of every physician and surgeon," the witness need not have specialized in that field. (*Mirich* v. *Balsinger*, 53 Cal.App.2d 103, 118 [127 P.2d 639].)

"The physician's and surgeon's certificate authorizes the holder to use drugs or what are known as medical preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions." (Bus. & Prof. Code, § 2137.) This certificate is given by the state, through its Board of Medical Examiners, only after satisfactory completion of a long and intensive course of education and training in a wide variety of subjects, designed to assure the state and the public that the holder of such a certificate is qualified to practice all phases of the healing arts. A mere perusal of the Medical

Practice Act (Bus. & Prof. Code, §§ 2000 to 2497) demonstrates that.

We think such a person, particularly in view of the years of hospital and private practice experience this doctor had, is qualified to observe a person and form and give in evidence an opinion concerning that person's sanity. He need not specialize in psychiatry to do so. As stated in *Estate of Dolbeer,* 149 Cal. 227, 248 [86 P. 695, 9 Ann.Cas. 795], "A general practitioner who has had experience in the various kinds of mental afflictions is as competent to testify to the sanity of a person as the skilled expert who devotes his entire time to the study of such diseases." One of the authorities cited in the Dolbeer case expresses the applicable principle in these words: "The liberal doctrine should be insisted on that the law does not require the best possible kind of a witness, but only persons of such qualifications as the community daily and reasonably relies upon in seeking medical advice. Specialists are in most communities few and far between; the ordinary medical practitioner should be received on all matters as to which a regular medical training necessarily involves some general knowledge. This rule has been applied for sundry subjects, chiefly that of poisons, and also of *insanity.*" (1 Wigmore on Evidence, 1904 ed., 682-683, § 569.)

Our attention has been called to decisions such as *Huffman* v. *Lindquist, supra,* 37 Cal.2d 465, 476-479, and *Sinz* v. *Owens, supra,* 33 Cal.2d 749, 755-758, which hold that a physician and surgeon, asked for his opinion concerning the standard of practice in a special field of medicine or surgery, must have had a certain amount of occupational experience in that field Those decisions are not applicable here, where the question pertains to a subject that lies within the area of the knowledge and observation of every physician and surgeon.

This principle was pointedly applied in the recent decision of our Supreme Court in *Thompson* v. *City of Long Beach,* 41 Cal.2d 235 [259 P.2d 649]. Four general practitioners had testified that appellant's impaired vision precluded her from doing the work of a stenographer satisfactorily. They relied principally on her impaired ability to read distance charts accurately and without strain (pp. 240 and 241). She cited opposing medical testimony of eye specialists in her behalf. That merely created a conflict in the record. Appellant had made no objection to the competency of the four general practitioners. Yet the court expressed the

opinion that they were competent: "While they were general practitioners rather than eye specialists, this fact did not affect their competency but only went to the weight to be accorded their testimony. (Cases anno: 54 A.L.R. 860, 861.) [*] Manifestly, the qualification of the general practitioners to testify as expert witnesses concerning appellant's admitted visual defects and the effects of such defects on appellant's ability to satisfactorily perform her work had no relation on their familiarity with the standards of care required in the treatment of eye conditions. So distinguishable is the situation in *Huffman* v. *Lindquist, supra*, 37 Cal.2d 465 [234 P.2d 34], where at page 476 it was declared that the trial court had not abused its discretion in sustaining an objection to the qualification of an autopsy surgeon to 'testify as an expert with regard to the *question of whether defendant doctor had exercised the proper and requisite degree of skill and care.*' (Emphasis added.)" (P. 242.) That fits our case, if we substitute "eye, ear, nose and throat specialist" for "general practitioner" and "mental condition" or "sanity" for "visual defects" and "eye conditions." In our case, the doctor's opinion was based no his own observations. The trial judge, when he allowed the question, passed upon the adequacy of those observations (the opportunity to observe) as well as the competency of the witness to form and give an opinion as to the decedent's sanity. We find in that ruling no abuse of discretion, no basis for a reviewing court to characterize it as error and to reverse the judgment.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied September 18, 1953, and the following opinion was then rendered:

THE COURT.—Appellant in her petition for rehearing calls attention to the fact that this court in its opinion filed herein did not "consider the question of a delusion as opposed to the issue of general insanity," asserting there is in this case a significant difference between those two terms because her

---

*The writer of the note in 54 A.L.R. 860-869 assembles cases from various jurisdictions indicating that the majority view is that physicians and surgeons (not specialists in treating mental conditions) are competent to testify concerning sanity. (863-866.)

claim that decedent lacked testimentary capacity was not predicated upon the "general insanity of the decedent," but upon his having "a limited and special form of mental derangement constituting a delusion concerning his daughter," the appellant.

That distinction, if there be one, is not significant upon this appeal for appellant did not object to the challenged testimony of Dr. Lowenstein upon any such ground. He was asked: ". . . would you express an opinion as to whether he was sane or insane?" Appellant objected upon the ground that the doctor was not qualified to answer that question, not that it was a question which called for an opinion as to "general insanity" as distinguished from a delusion. (See p. 798.)

Appellant's petition for a hearing by the Supreme Court was denied October 15, 1953.