[L. A. No. 21416. In Bank. June 29, 1951.]

HILDA HUFFMAN, Appellant, v. DR. C. A. LINDQUIST et al., Respondents.

Martin, Hahn & Camusi, William P. Camusi and Marion P. Betty for Appellant.

Chase, Rotchford, Downen & Drukker, Chase, Rotchford, Downen & Chase, Hugh B. Rotchford, Richard T. Drukker, Musick, Burrell & Ingebretsen and Anson B. Jackson, Jr., for Respondents.

Peart, Baraty & Hassard, George A. Smith, Alan L. Bonnington, Reed & Kirtland and Louis J. Regan, as Amici Curiae on behalf of Respondents.

SPENCE, J.—Plaintiff brought this action against defendant doctor and defendant hospital for alleged malpractice and negligence in the treatment and care of her deceased son after he had been injured in an automobile collision. At the close of plaintiff's case, nonsuits were granted to defendant doctor and defendant hospital upon their separate motions therefor. Judgments were entered accordingly and from said judgments, plaintiff appeals.

In challenge of the propriety of the nonsuits, plaintiff claims that she made out a prima facie case of malpractice and negligence on the part of defendants as the proximate cause of her son's death. But viewing the evidence in the light most favorable to plaintiff and disregarding conflicts, in accordance with the settled rule applicable in testing the validity of nonsuits (*Lawless* v. *Calaway*, 24 Cal.2d 81, 85

[147 P.2d 604]; *Lashley* v. *Koerber,* 26 Cal.2d 83, 84-85 [156 P.2d 441]; *McCurdy* v. *Hatfield,* 30 Cal.2d 492, 493 [183 P.2d 269]), the conclusion appears inescapable that plaintiff's position cannot be sustained.

Plaintiff's son, 19 years old, suffered a head injury and fractured skull in an automobile collision near midnight of Saturday, March 16, 1946, and he was taken to defendant hospital for treatment. About an hour later—1 a.m. Sunday, March 17—an intern notified plaintiff that her son had been injured. In response to her inquiry if he was the doctor in charge, he said that he was an intern but that Dr. Lindquist took care of emergency cases. Approximately 15 minutes later plaintiff arrived at the hospital, where she remained in her son's room constantly, with the exception of short intervals and one two-hour period, until his death about 1 a.m. Monday, March 18.

Upon her arrival plaintiff found her son in the emergency room attended by Dr. Brothers, an intern, who, upon inquiry, told her that defendant doctor would be there shortly. At that time the boy was conscious and able to speak to plaintiff. Thereafter, about 2:30 a.m. (Sunday, March 17) he was moved to a private room, at which time he was "kind of dopey" and "drowsy," not restless, and while he seemed to understand statements made to him, he did not answer.

Defendant doctor made his first visit to plaintiff's son at 10 o'clock Sunday morning, at which time when examined by the doctor, the boy seemed "more unconscious" but was still not restless. At 12 noon the boy became restless, hot and feverish; the last time he spoke was about 1.15 p.m.; and the last sign of physical recognition was about 3 o'clock that Sunday afternoon. At 3:45 p.m. he became very restless and feverish, was not able to understand plaintiff, and although not "completely unconscious," he was "very much worse." At 7:30 o'clock Sunday evening defendant doctor visited the boy, felt his pulse and opened his eyes. Plaintiff left the hospital for a couple of hours—9 p.m. to 11 p.m.— and upon her return, she observed a serious change in his condition; he was unconscious and in a coma, not moving, and was breathing very hard and labored; had developed a rattle in his throat. At 12:45 o'clock the next morning, Monday, March 18, the boy stopped breathing, though his heart was still beating, as defendant doctor entered the room. The doctor immediately called for a respirator or pulmotor, and Dr. Schetgen, an intern, brought the pulmotor but it

failed to function; it was replaced, but the second one also failed to work. Then finally, a third machine was procured and used one or two minutes, when defendant doctor pronounced the boy dead.

The boy's sister spoke to defendant doctor at 5 p.m. and at about 7:30 p.m. on Sunday, stating that she desired to have a certain brain specialist called on the case; that she felt that her brother's condition was "very bad" and something should be done that evening. She testified that the doctor said that he would see what could be done along that line the next day.

The death certificate, introduced in evidence by plaintiff, showed the immediate cause of death to be "pulmonary embolism," due to "cerebral contusion and hemorrhage" due to "fracture of skull."

The only direct expert testimony was that of defendant doctor, called as a witness by plaintiff under section 2055 of the Code of Civil Procedure. He testified that the emergency service of the hospital called him about 1 or 1:30 a.m. Sunday, March 17; that the reporting intern said that he thought the patient "had a possible skull fracture . . . a brain injury . . . was semi-conscious"; that he told the intern to have the patient admitted and to watch him, keep a chart of hourly recordings as to blood pressure, pulse and respiration, and report any change, and give the patient some sedative (phenobarbital or codeine) in the event that he became restless. According to the doctor, when he first saw the boy about 10 o'clock Sunday morning, the boy was "semi-conscious, rather restless . . . his blood pressure . . . pulse and temperature were within normal limits . . . his eyes were dilated but they reacted to light." The doctor stated that he did not prescribe any different care except to order a glucose injection, but he recognized then that the boy had a brain injury with "some hemorrhage"—either epidural (between the bony vault of the brain and the dura, which is the tough membrane surrounding the brain) or subdural (between the dura and the brain)—although he did not know the extent or location until he "saw the coroner's report"; and he added that he saw the boy four times on Sunday, March 17: about 10 o'clock in the morning, at noon, a little before 7:30 p.m., and around midnight.

Defendant doctor further testified that he specialized in traumatic surgery; that he had been in practice and on the staff of defendant hospital for 22 years in attending emer-

gency cases; that he had assisted in brain operations, and when he had a brain injury case he was accustomed to calling in a specialist if he thought the condition of the patient so warranted; that a brain injury is usually accompanied by dilation of the pupils of the eyes, a condition which, when accompanied by lack of reaction to light, is one of the symptoms of an epidural hemorrhage; that when he examined plaintiff's son at 10 o'clock Sunday morning, the pupil of the boy's right eye was slightly dilated, though it still reacted to light, and he found a suggestive Babinsky, indicative of a brain injury.

The autopsy report recited that plaintiff's son had an "epidural hemorrhage 1.5 cm. thick." When questioned as to the factors considered in "determining whether or not there is epidural hemorrhage," the doctor stated: "I take into consideration whether he is getting any increased intracranial pressure, which is the usual sign, as they become gradually more unconscious, go into a deep stupor, their blood pressure usually climbs way high with a slowing of their pulse, . . . the respirations get slower, and [the] pupil then generally becomes dilated completely, right out to the rim, and it is fixed, you cannot make it contract with any amount of light you wish to put in it . . . As a general rule, from all I can find out in talking to neurosurgeons, when a pupil will react to light, it is not serious." Then in reply to the question "All right, Doctor, let us assume that you have a case of epidural hemorrhage, . . . is it not true that if the bleeding continues and no operation is made to clean out that clot, open the brain, the patient will surely die," the doctor said: "Certainly if the hemorrhage continues to make that clot big enough to create enough pressure on your brain, you are going to die, surely."

In discussing the classical picture of an epidural hemorrhage, the doctor stated that in the majority of cases the patient is (1) unconscious; (2) lucid; (3) gradually unconscious. He described the "lucid interval" as a condition where "a patient receives some head injury, is knocked unconscious, maybe minutes, maybe seconds, he then becomes conscious, the usual thing is he gets up, walks around about his business, whatever it is, then an hour, two hours, ten hours, twelve hours that patient begins to complain of headache, the headache increases and if somebody examines his pulse, he will start to become slower, if it goes long enough, he will become unconscious." The doctor testified that the

conservative (nonsurgical) rather than the radical (operative) treatment was better in the early stages of a head injury case; that pursuant to his instructions, the interns and attendants at the hospital "were giving [the boy] the conservative treatment to try to keep him quiet; they were taking his blood pressure . . . his pulse . . . his temperature, his respirations to indicate" if his intracranial pressure was increasing; that the boy's condition on the occasion of his 7:30 o'clock visit Sunday evening was about the same as it had been that morning; and that the chart readings shown for 11:30 o'clock that evening revealed the boy's condition to have become worse, that "something went wrong" in the boy's brain, but still the symptoms were "not necessarily" those indicative of an epidural hemorrhage as distinguished from some other type of brain bleeding. With regard to the death certificate's recital of "pulmonary embolism" as the immediate cause of death, the doctor stated the term meant a "foreign body, a blood clot that has lodged in a blood vessel," in this case "the lungs"; that, in his opinion, the "embolism, [the] blood clot which caused death in the lungs [could] not come from" an "epidural hemorrhage" but had to have "some other origin"; that whether "bleeding inside the brain" could "have led to an embolism," he was "not enough of a pathologist to answer that" but that "pulmonary emboli," the "nightmares of surgeons," can come from very trivial things, minor injuries, "can originate in any blood vessel in [the] body"; and that he knew of no "way in the world, with the boy with a head injury such as [he] found, that [he] could have prevented the formation of a pulmonary embolism."

With respect to her malpractice charge against the doctor, plaintiff claims that the evidence, together with reasonable inferences legitimately deducible therefrom, establishes a prima facie case of negligence against the doctor by reason of his failure to diagnose at the outset the presence of epidural hemorrhage as the brain injury suffered by her son and to recognize the need for an operation by a brain specialist to remove the intracranial pressure on her son's brain. In this regard she maintains that the pulmonary embolism was a terminal condition appearing because of the failure to perform the brain operation. Defendant doctor contends that the physical condition of plaintiff's son did not reflect the classical picture of an epidural hemorrhage or suggest the adoption of any procedure other than the conservative, non-

surgical treatment recommended and regularly followed by the medical profession in brain injury cases. He further maintains that the evidence beyond contradiction establishes that plaintiff's son died as the result of a blood clot on the lungs caused by the original fractured skull, bruising and bleeding of the brain, and that there is absent any showing of causal connection between the treatment he followed and the formation of the fatal blood clot.

There are certain general principles to be noted in relation to malpractice cases. ■ The "law has never held a physician or surgeon liable for every untoward result which may occur in medical practice" (*Engelking* v. *Carlson*, 13 Cal.2d 216, 220 [88 P.2d 695]; *Lashley* v. *Koerber, supra,* 26 Cal.2d 83, 88-89) but it "demands only that a physician or surgeon have the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality and that he exercise ordinary care in applying such learning and skill to the treatment of his patient" (*Lawless* v. *Calaway, supra,* 24 Cal.2d 81, 86). ■ No different or "higher degree of responsibility" is imposed "in making a diagnosis than in prescribing treatment." (*Patterson* v. *Marcus,* 203 Cal. 550, 552 [265 P. 222]; see, also, *Ries* v. *Reinard,* 47 Cal.App.2d 116, 119 [117 P.2d 386].) ■ A doctor's failure to possess or exercise the requisite learning or skill "in a particular case is generally a question for experts and can be established only by their testimony" (*Trindle* v. *Wheeler,* 23 Cal.2d 330, 333 [143 P.2d 932]; also *Church* v. *Bloch,* 80 Cal.App.2d 542, 547 [182 P.2d 241]), which "expert evidence is conclusive" where it appears that the "matter in issue is one within the knowledge of experts only and is not within the common knowledge of laymen" (*Engelking* v. *Carlson, supra,* 13 Cal.2d 216, 221). Application of these principles in this case sustains defendant doctor's position that plaintiff's charge of malpractice is not supported by the record.

The classical symptoms of an epidural hemorrhage, as the basis for defendant doctor's diagnosis and as recited by him, did not appear according to the chart readings and observations of plaintiff's son made at the hospital. With an inconclusive record before him—failing, as it did, to exhibit the accepted pattern confirmatory of an epidural hemorrhage—defendant doctor maintains that there was nothing to indicate that the usual conservative treatment followed in brain injury cases was inappropriate in relief of plaintiff's

son, or that there was need for consultation with a brain surgeon upon the premise that an epidural hemorrhage was in fact present. However, to this latter point, it might be noted that defendant doctor testified that while he did not think it necessary, nevertheless following the request of the family, he did discuss the condition of plaintiff's son with one of four specialists whom he regularly used in brain injury cases, and that after he "gave . . . the symptoms," the specialist said "there was nothing to be done that was not being done." No evidence was produced in contradiction of this testimony.

██ "Negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved." (*Engelking* v. *Carlson, supra,* 13 Cal.2d 216, 221; *Lashley* v. *Koerber, supra,* 26 Cal.2d 83, 89.) ██ While in a restricted class of malpractice cases the courts have applied the doctrine of res ipsa loquitur, that has been only where "negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge [and] expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact." (*Lawless* v. *Calaway, supra,* 24 Cal.2d 81, 86.) But this is not such a case, for here what was done lay outside the realm of the layman's experience. The physical factors to be noted in the diagnosis of the brain injury, as well as the merits of such a diagnosis, were matters of medical learning, peculiarly within the knowledge of experts. An analogous situation was involved in *Lawless* v. *Calaway, supra,* where an internal abdominal ailment was erroneously diagnosed and treated as ptomaine poisoning instead of appendicitis, and the patient died of a ruptured appendix. In commenting upon the sufficiency of the evidence to withstand the granting of a nonsuit in favor of the defendant doctor, the court said at page 89: "It was not only necessary for plaintiff to prove a mistake in diagnosis, but also that the mistake was due to failure to exercise ordinary care in making the diagnosis (*Patterson* v. *Marcus,* 203 Cal. 550, 552 [265 P. 222]), and mere proof that the treatment was unsuccessful is not sufficient to establish negligence. (*Nicholas* v. *Jacobson,* 113 Cal.App. 382, 386 [298 P. 505].)" ██ So here, the record presents at most a case of mistaken diagnosis, but according to the only expert evidence on the procedure followed, that of defendant doctor, the symptoms exhibited by plaintiff's son were not such as customarily accompany an

epidural hemorrhage. ▮ Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient (*Hesler* v. *California Hospital Co.,* 178 Cal. 764, 766-767 [174 P. 654]; *Perkins* v. *Trueblood,* 180 Cal. 437, 441 [181 P. 642]; *Jensen* v. *Findley,* 17 Cal.App.2d 536, 543 [62 P.2d 430]), for a doctor is not a "warrantor of cures" (*Johnson* v. *Clarke,* 98 Cal.App. 358, 361 [276 P. 1052]) or "required to guarantee results" (*Adams* v. *Boyce,* 37 Cal.App.2d 541, 549 [99 P.2d 1044]; also *Markart* v. *Zeimer,* 67 Cal.App. 363, 371 [227 P. 683]; *Rising* v. *Veatch,* 117 Cal.App. 404, 409 [3 P.2d 1023]; *Beni* v. *Abrons,* 130 Cal.App. 206, 211 [19 P.2d 523]; *Sansom* v. *Ross-Loos Medical Group,* 57 Cal.App.2d 549, 552-553 [134 P.2d 927]).

So distinguishable is the case of *McCurdy* v. *Hatfield, supra,* 30 Cal.2d 492, cited by plaintiff, where a judgment of nonsuit was reversed. There the plaintiff testified concerning the treatment she received from the defendant doctor, and the latter's own testimony established his negligence in view of his admission that the procedure he allegedly followed in plaintiff's case "would be bad practice." (P. 495.) Such medical testimony "as to what was proper practice" was presumably "based on the standard of care used by physicians in the locality"; if the defendant doctor "failed to conform" therewith, "he did not act as a reasonable physician should under the circumstances"; and a "prima facie case of negligence" was established, for the evidence was such that "a jury could have found that defendant was negligent in departing from the standard of care required." (Pp. 495-496.) ▮ But the present record is devoid of any evidence from which it could reasonably be inferred that defendant doctor was guilty of any breach of proper practice in his diagnosis or treatment of the boy's brain injury according to the symptoms revealed; and under these circumstances the record must be held lacking in any evidence to establish negligence on his part.

Moreover, regardless of any question of the insufficiency of the evidence to establish negligence, there is no evidence to show that any act or omission on the part of defendant doctor was the proximate cause of the boy's death. The uncontradicted evidence introduced by plaintiff showed that the "immediate cause of death" was the pulmonary

embolism, and there is no evidence to show that such embolism would not have caused the death in spite of the most careful and skillful diagnosis and treatment. In short, the evidence is wholly insufficient on the issue of proximate cause, as there is no evidence to show that anything that might have been done by anyone in the diagnosis or treatment of plaintiff's son would have prevented the boy's unfortunate death, at the time and in the manner that it occurred, as the result of the pulmonary embolism following the serious injuries which he received.

Plaintiff further complains of the trial court's exclusion of certain testimony of the special nurse on duty in care of plaintiff's son. This testimony concerned an intern's statement to her as to the advisability of an operation in relief of the boy's condition. The testimony was excluded as hearsay. Admittedly, defendant doctor was not present at the time of the making of the statement, nor was there any proof that such statement was ever communicated to him. The intern was in the employ of the hospital. There was no evidence of any authority on the part of the intern to speak for defendant doctor in the matter (*Whitaker* v. *Title Ins. & Trust Co.,* 186 Cal. 432, 435-436 [199 P. 528]) or any premise for invocation of the doctrine of *respondeat superior.* (*Harris* v. *Fall,* 177 F. 79, 85; *Stewart* v. *Manasses,* 244 Pa. 221 [90 A. 574, 575].) Under these circumstances the court properly excluded the testimony in question.

Nor is there any merit to plaintiff's challenge of the propriety of the trial court's ruling in sustaining the objection to the qualification of Dr. Frank Webb to testify as an expert with regard to the question of whether defendant doctor had exercised the proper and requisite degree of skill and care.

A medical expert is not qualified as a witness unless it is shown that he is familiar with the standards required of physicians under similar circumstances. (*Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Moore* v. *Belt,* 34 Cal.2d 525, 532 [212 P.2d 509].) It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence (*Mirich* v. *Balsinger,* 53 Cal.App.2d 103, 114 [127 P.2d 639]), and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown. (2 Wigmore on Evidence [3d ed.], § 561, p. 641; *Sowden* v. *Idaho Quartz M. Co.,* 55 Cal. 443, 451; *Sinz* v. *Owens, supra,* 33 Cal.2d 749, 755-756.) The

competency of an expert "is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement." (2 Wigmore on Evidence [3d ed.], § 555, p. 634.)

Dr. Webb's qualifications were examined at considerable length. It appeared that following his graduation from the College of Physicians and Surgeons, Columbia University, in 1902, he had served on hospital staffs and engaged in general medical practice, "gradually drifting into obstetrical work and gynecology"; that in 1912 he came west in the employ of a Canadian railroad and supervised for three years a hospital which it maintained principally for the care of accident and traumatic injury cases, but also for the treatment of varied pathological diseases; and that in 1915 he located in Los Angeles, where he joined the teaching staff of a local university and for six years gave courses on anatomy in the medical and dental schools. While so acting as a college instructor and in 1917, he became associated with the county coroner's office, and remained there until his retirement from the medical field in 1946, serving first as an assistant and then for the final six years as Chief Autopsy Surgeon. Dr. Webb testified that in his 29 years with the coroner's office he performed some 35,000 to 40,000 autopsies, including some 5,000 cases of head injuries; and that in the determination of the cause of death in each instance, it was his custom to obtain a complete history of the case as to diagnosis and treatment, with many of the consultations concerning brain injuries.

On cross-examination, it appeared that Dr. Webb was not a member of the county medical association; that he had never associated himself with any hospital staff during his practice in Los Angeles; and that in the performance of his duties in the coroner's office, his consultation with other doctors in reference to head injury cases consisted in their advising him, after the treatment was given, what was done but that he took "no initiative in the treatment." It further appeared that during the past 25 years he had never operated on any living patient; that in the last 10 years he had never actively participated in the treatment of any case involving a head injury or an embolism, and that his only connection in that time with the care of a patient suffering from an epidural hemorrhage was his reference of the case to another doctor. Upon this state of the record, the trial court sustained the objection to Dr. Webb's qualification to testify as an expert and refused to permit him to answer the hypothetical question proposed by plaintiff's counsel.

The definitive criteria in guidance of the trial court's determination of the qualifications of an expert witness are recognized in *Sinz v. Owens, supra,* 33 Cal.2d 749, to rest primarily on "occupational experience," as stated at page 753: "The proof of that standard (the reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances) is made by the testimony of a physician qualified to speak as an expert and having in addition, what Wigmore has classified as 'occupational experience — the kind which is obtained casually and incidentally, yet steadily and adequately, in the course of some occupation or livelihood.' (2 Wigmore on Evidence [3d ed.] § 556, p. 635.) He must have had basic educational and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured." By his own testimony Dr. Webb established the questionable sufficiency of his medical background and knowledge to permit his testifying on the requisite skill and care here concerned because of (1) his lack of active practice in California within the last 25 years, and (2) his lack of occupational experience in the treatment of living patients suffering comparable brain injuries and complications resulting in pulmonary embolisms. Plaintiff cites the case of *Valentin v. La Societe Francaise,* 76 Cal.App.2d 1 [172 P.2d 359], where this same Dr. Webb was held qualified to testify in a malpractice case involving death from a tetanus infection. But that was an action against a hospital for alleged negligence of its nurses in postoperative care of a patient coincident with their failure to recognize an obvious and growing case of tetanus, so that appropriate treatment could be administered without delay. In establishing Dr. Webb's competency to testify with respect to the requisite standard of care which the hospital was bound to exercise, his qualifications were based primarily upon his familiarity with the records of the Los Angeles County Hospital in tetanus cases and his extensive knowledge on the subject of proper antitetanic treatment as gleaned from current experience in that particular field. But each case must be judged on its own facts, and it cannot be said here

that the trial court abused its discretion in holding Dr. Webb unqualified on the subject under discussion. (See *Moore* v. *Belt, supra,* 34 Cal.2d 525, 531-532.)

Finally, in disposition of plaintiff's charge of malpractice against defendant doctor, there remain two other points for consideration: (1) Plaintiff claims that the doctor was negligent in failing to give complete and proper instructions to the interns and nurses as to what symptoms should be observed and reported to him. However, there is no evidence to substantiate this charge of the doctor's alleged inadequate supervision. The doctor testified that he was having hourly reports and observations made of the prime factors to watch in the progressing pathology of the patient, and that he relied on such recordings and notes in making his diagnosis and prescribing treatment. There was no showing that defendant doctor's reliance on these charts was inconsistent with standard medical practice in the diagnostic and treatment field. (2) Plaintiff also contends that defendant doctor was negligent in failing to know how to operate a pulmotor in providing artificial respiration. But such machine was the property of the hospital, and the intern, as the hospital's employee, was the person who was supposed to know how it worked. Defendant doctor admitted that he did not know how the machine functioned, but there is nothing in the record to establish that a practicing doctor should have such knowledge as a matter of standard practice and in the exercise of the required standard of care.

As the record has been above reviewed with regard to the alleged malpractice claim against defendant doctor, it is manifest that plaintiff has failed to prove that the doctor was negligent or unskilful in his diagnosis and adoption of the conservative, nonsurgical treatment of the brain injury sustained by plaintiff's son, or that want of skill or care on his part caused the boy's death. Rather, the evidence establishes that the pulmonary embolism was the cause of death, and that its development was independent of anything that defendant doctor did or did not do in his treatment of plaintiff's son. In the face of such absence of a causal connection between the death of plaintiff's son and defendant doctor's acts, the conclusion is inescapable that a nonsuit was properly granted as to him.

There now remains for consideration plaintiff's charge of negligence against the hospital. In this connection

plaintiff argues that the hospital was negligent in these particulars: (1) assuring her that defendant doctor would immediately attend her son while it was known that he would not see him until some eight or nine hours later; (2) carelessness of the interns and nurses in keeping records of the boy's condition so as to reflect accurately the progressively deteriorating pathology; and (3) failure to keep the pulmotors in proper functioning order. Without unduly extending the discussion of these claims, suffice it to say that an examination of the record does not disclose any causal connection between the alleged negligent conduct and the boy's death from the pulmonary embolism. (*Reynolds* v. *Struble,* 128 Cal.App. 716, 725 [18 P.2d 690]; see, also, *Michael* v. *Roberts,* 91 N.H. 499 [23 A.2d 361, 362].) In regard to this phase of the case, it must be conceded that the hospital's failure to have its pulmotors in working order might constitute actionable negligence under some circumstances, but there is no evidence that such failure was the proximate cause of the boy's death —that the boy would have lived if the first two pulmotors had worked—and the doctrine of res ipsa loquitur is entirely inapplicable. (65 C.J.S. § 220(8), p. 1011; *Keller* v. *Cushman,* 104 Cal.App. 186, 189 [285 P. 399]; *Dunlavy* v. *Nead,* 36 Cal.App.2d 478, 481 [97 P.2d 1003].) Hence, there was no error in granting the nonsuit in favor of defendant hospital.

The judgments are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., and Edmonds, J., concurred.

Traynor, J., concurred in the judgment.

CARTER, J.—I dissent.

I am of the opinion that the refusal of the trial court to qualify Dr. Webb as plaintiff's expert witness constituted an abuse of discretion and reversible error. There is no doubt in my mind that his experience and training were more than ample to permit his qualification.

Dr. Webb is a graduate of Columbia Medical School. After graduation, he served for three years at Government Hospital, Washington, D. C., and there dealt specifically with head injury cases; from 1905 until 1912, he practiced general medicine, gynecology and obstetrics in New York City; from 1912 until 1915, he was in charge of a hospital for the Pacific Great Eastern Railway where the cases were largely accident

or traumatic injury; from 1915 until 1918, he taught anatomy and histology at the medical school of the University of Southern California; from 1918 until 1921, he taught the same subjects and pathology in the dental school of the same university. In 1917 until 1946, Dr. Webb was associated with the county coroner's office where he was, at first, assistant autopsy surgeon, then autopsy surgeon, and finally chief autopsy surgeon for the entire county of Los Angeles. During his 29 years in the coroner's office, *Dr. Webb personally performed 35,000 to 40,000 autopsies of which at least 5,000 were on persons who had died of head injuries.* Dr. Webb testified that it was necessary to obtain for each autopsy case a complete history of the causative factors and management and treatment of the case prior to death; that such autopsies were often performed because the attending physician could not diagnose the cause of death. He further testified that he conferred with the attending physicians on brain injury cases; that among these attending physicians were Doctors Coviello and Glazier, outstanding brain specialists, and that they had given him the complete history, care and treatment of the patients; that on many occasions he was visited at these autopsy proceedings by doctors and interns from the hospitals. He also testified that he had discussed with the specialists whether or not each case was one indicating the need for an operation; *that he had conferred with doctors at the county hospital on head injury cases and was familiar with the practice and procedure at that hospital in such cases;* that he studied medical periodicals and textbooks on the subject of head injuries. *He testified that he had become familiar with the practice and procedure adopted by reputable physicians and surgeons in the treatment and care of traumatic injuries to the head and brain.*

It is interesting to contrast the qualifications of Dr. Lindquist who testified that he did not do any operative work on the skull; that in his 25 years of practice he had assisted at a *few* operations on the brain; that in the last year he had assisted at *one* brain injury operation. Dr. Lindquist was a member of the Los Angeles County Medical Association; Dr. Webb had been invited to join but had not seen fit to do so.

The majority opinion makes much of the fact that Dr. Webb had not operated, in 25 years, on any living patient. It is a matter of common knowledge that medical students,

doctors taking refresher courses in surgery, and those preparing themselves to specialize in surgery acquire their knowledge and skill in performing the exact type of work in which Dr. Webb was engaged. The anatomy of the human body is the same whether the patient is living or dead. In addition to Dr. Webb's training and knowledge in the field of anatomy (particularly that of the brain on which he had performed over 5,000 autopsies) he knew the symptoms of the patient and the care and treatment which had been administered during that person's illness. It is difficult for me to see how one person could have a more complete background or be better qualified to testify. Dr. Webb knew all there was to know concerning each patient and he knew exactly what had been done for that patient by the doctor or doctors who attended him. If he knew, as he did, the diagnosis, care and treatment accorded the patients by the doctors, among whom were the leading specialists in that field of medicine, in the community, it seems to me that it must follow that he was familiar with the customary practices and medical standards prevalent in the community.

Dr. Webb was held qualified to testify in a malpractice case involving death from a tetanus infection (*Valentin* v. *La Societe Francaise* [1946], 76 Cal.App.2d 1, 7, 8 [172 P.2d 359]) and yet his qualifications at that time were the same as they are at the present. He had been in the coroner's office for some time and had treated no living patient; he was not a member of the county medical association; he was not engaged in active practice in the state. The majority opinion, in attempting to distinguish the Valentin case, states that there the action was against a hospital for malpractice and that Dr. Webb was qualified primarily because of his familiarity with the records of the county hospital in tetanus cases. The hospital there was not the county hospital nor is that hospital involved here. And yet Dr. Webb testified there that he was familiar with tetanus treatment at the county hospital; here he testified that he was thoroughly familiar with the treatment and care of brain cases at the county hospital. There, as here, he testified that he kept himself informed by reading textbooks and medical periodicals about the various ills of the human body. Aside from the fact that a tetanus infection was involved in the Valentin case, I find the two cases indistinguishable. If Dr. Webb could be said to be more qualified to testify in one of the two cases than in the other, I would say that the balance is with

the case under consideration here. An injury to the skull and brain would fall more in the field of anatomy than would a tetanus infection. Dr. Webb's 29 years' experience in the coroner's office, as well as his knowledge and ability as a teacher of anatomy have undoubtedly made him an expert in that type of medicine.

"A doctor's failure to possess or exercise the requisite learning or skill 'in a particular case is generally a question for experts and can be established only by their testimony' . . . which 'expert evidence is conclusive' where it appears that the 'matter in issue is one within the knowledge of experts only and is not within the common knowledge of laymen' . . . ." It is a matter of common knowledge that members of any county medical society are extremely loath to testify *against* each other in a malpractice case. It would be very difficult for a plaintiff to produce, at a moment's notice, a panel of doctors whose qualifications might satisfy the standards which apparently had to be met in this case. As a result of the disqualification of Dr. Webb, the plaintiff here was effectively precluded from producing any evidence as to the proper and customary practice and procedure in the treatment and care of an injury such as the one received by her son. The alleged negligence of Dr. Lindquist was a matter not within the common knowledge of laymen but was one which required the testimony of an expert. The disqualification of Dr. Webb had the effect of depriving plaintiff of the opportunity to put her case before the jury because no matter what other evidence she produced, she could not prove negligence on the part of Dr. Lindquist without expert testimony. The jury, having the facts before it, should have been permitted to hear Dr. Webb's testimony and to decide for itself the question of fact presented for its determination—the alleged negligence of Dr. Lindquist.

The effect of the majority holding in this case is to place in the hands of a trial judge the power to prevent a plaintiff in a malpractice case, where expert testimony is required, from presenting any evidence on the issue that defendant failed to exercise the degree of care and skill which reputable physicians in the community would have exercised, as testimony in support of such issue can be given only by a qualified expert who is a physician. If, as held by the majority, a trial judge has the power to exclude the testimony of a witness as well qualified as Dr. Webb, then whenever a malpractice case is tried before a trial judge who has a leaning

against such cases, the plaintiff can never prevail regardless of the number or qualifications of the expert witnesses produced by him. Anyone familiar with cases of this character knows that the so-called ethical practitioner will not testify on behalf of a plaintiff regardless of the merits of his case. This is largely due to the pressure exerted by medical societies and public liability insurance companies which issue policies of liability insurance to physicians covering malpractice claims. While court records show that some of these claims may be questionable, many have substantial merit and ethical considerations are generally with the plaintiff's side of the case. But regardless of the merits of the plaintiff's case, physicians who are members of medical societies flock to the defense of their fellow member charged with malpractice and the plaintiff is relegated, for his expert testimony, to the occasional lone wolf or heroic soul, who for the sake of truth and justice has the courage to run the risk of ostracism by his fellow practitioners and the cancellation of his public liability insurance policy. "The regimen I adopt shall be for the *benefit of my patients* according to my ability and judgment, *and not for their hurt or for any wrong.*" (The Hippocratic Oath.) (Italics added.)

While the foregoing considerations do not constitute a sound basis for permitting an unqualified witness to offer expert testimony, they should weigh heavily with both trial and appellate courts in passing on the qualifications of such an expert witness in a malpractice case. I submit that the majority holding, sustaining the ruling of the trial court in rejecting the expert testimony of Dr. Webb in this case, places a stamp of approval upon a vicious practice which is destined to thwart the fair and equal administration of justice.

For these reasons I would reverse the judgment.

SCHAUER, J., Dissenting.

I concur in the conclusion reached by Justice Carter. Dr. Webb testified that in his practice and medical experience he had "become familiar with the practice and procedure adopted by reputable physicians and surgeons in the treatment and care of traumatic injuries in general in Los Angeles and vicinity" and also that he had "become familiar with the practice and procedure adopted by reputable physicians and surgeons in the treatment and care of traumatic injuries to the head and brain." The details of his varied experience,

following graduation from the College of Physicians and Surgeons at Columbia University in 1902, are reflected in his testimony through many pages of transcript. The inferences to be drawn from such details of experience in respect to the *weight* which should be accorded Dr. Webb's opinions on the questions at issue may vary, but one thing seems certain to me: he was qualified as an expert competent to form and express an opinion on those questions. Considering all of the evidence touching on his qualifications, it surely does not destroy, but rather supports, the ultimate conclusionary facts above quoted.

The two hypothetical questions addressed to Dr. Webb went directly to the heart of plaintiff's case. In my view it was, under all the circumstances, an abuse of discretion, and prejudicial error, to hold that Dr. Webb was not qualified to answer those questions.

The judgment of nonsuit should be reversed.

Appellant's petition for a rehearing was denied July 26, 1951. Carter, J., and Schauer, J., voted for a rehearing.