[Civ. No. 20076. Second Dist., Div. One. Apr. 18, 1955.]

INTERNATIONAL AIRPORTS, INC. (a Corporation), Respondent, v. CHARLES C. FINN et al., Appellants.

(Two Cases.)

294

Charles C. Finn and George C. Finn, in pro. per., for Appellants.

A. J. Blackman for Respondent.

DRAPEAU, J.—Defendants owned a Curtiss-Wright C46 aircraft which they wanted to operate commercially. Plaintiff agreed to do the work required to license the plane for that purpose. Pursuant to an agreement executed by the parties on August 31, 1951, plaintiff lent defendants $15,000. To secure this loan defendants executed a promissory note and a chattel mortgage.

The agreement provided that the required work was to be completed within 90 days after delivery of the plane, defendants to furnish certain necessary items on demand from plaintiff: seats, tail assembly and other fittings; licensing and operating specifications and hull insurance.

It was also agreed that plaintiff should lend defendants

additional funds up to $15,000, if required to complete their obligations under the contract. This sum to be added to the preceding loan and new papers executed for the total loan.

Defendants were required by the agreement to pay for the work on an actual cost basis of time, material, reasonable overhead and profit, the total not to exceed $29,500. And such amount was to be added to the preceding loan or loans and a new note and chattel mortgage executed to cover the total sum.

The total amount was to be amortized and paid in 18 equal monthly installments, commencing upon payment by plaintiff of the initial rental required by a lease of the airplane dated August 31, 1951. Succeeding monthly installments under the agreement were to be offset and deducted from succeeding rental payments.

Defendants were privileged to pay to plaintiff the entire balance at any time. And in the event of termination or cancellation of the lease, plaintiff extended to defendants a moratorium on their payments on the note for a period of 120 days or, if sooner, until said plane were sold or released.

Defendants granted to plaintiff "first refusal to purchase said aircraft at the same price and terms as are offered by any other bona fide intended purchaser."

The lease, above referred to, was executed concurrently with the agreement. It ran for a term of 18 months after actual delivery of the plane to plaintiff; such date to be not later than 90 days after the plane was delivered to plaintiff for performance of the work contemplated by the agreement. The rental for use of the aircraft was $5,000 per month which was subject to offset of defendants' payments on the note and chattel mortgage.

Defendants delivered the aircraft to plaintiff about October 19, 1951. Much of the work performed was done between November 16 and December 20, 1951. On the latter date, work was stopped by plaintiff for failure of defendants to deliver licensing specifications when demanded. Work was resumed sometime in March of 1952. About April 14th, defendants told plaintiff they could not deliver the seats and other equipment or the licensing specifications; and requested that plaintiff put the plane in bare flyable condition. Accordingly, plaintiff commenced additional work on the plane to put it in that condition under an agreement drawn up for that purpose. However, about April 18th, defendants brought

in their own crews, utilizing the hangar and the shops of plaintiff, and proceeded to do the work themselves.

On May 25, 1952, the aircraft was in plaintiff's hangar. That day, a man driving a truck came onto the field and unloaded some radios. "He opened the gate, let in a truck, a surplus arms carrier, with the Finns and three other men." The plane was towed a distance of 80 to 100 feet to the west side of the hangar, and the engines started. It was then taxied to the north end of the runway where it was parked on the ground. The six men returned to the truck and drove out the gate. A few days later the plane took off, headed north.

Shortly thereafter, plaintiff brought the instant actions against defendants for claim and delivery and for foreclosure of the chattel mortgage of August 31, 1951.

The two suits were consolidated for trial. The defendants were not represented by counsel but presented their own case in propria persona.

At the conclusion of a three-day trial, the court found: That the reasonable value of the work performed and the materials bestowed on the plane by plaintiff amounted to $10,014.43; that no promissory note secured by a chattel mortgage on the aircraft was ever executed to secure the value of said work and materials, as provided by the agreement of August 31st or the supplement thereto; and that plaintiff claimed a lien on the plane for the value of the work and material so furnished.

Also, that defendants without right and "by trick, device, force and duress" took the plane from plaintiff's possession and without its consent.

Further, the plaintiff was not in default under the contract or the lease and that defendants were in default.

From the facts found, the court concluded that plaintiff was entitled to:

1. A judgment against defendants for the possession of the plane or in the alternative the sum of $10,014.43;

2. A lien against the aircraft to secure the said sum of $10,014.43;

3. Enforce and foreclose the chattel mortgage of August 31, 1951, upon the plane covered thereby, and to have the plane sold and the proceeds applied upon the payment of the $15,000 evidenced by the promissory note. And also upon attorneys' fees of $750.

From the judgment which followed, defendants appeal.

It is first contended that no lien can be imposed upon the aircraft. This for the reason that the supplement to the agreement executed early in September of 1951 expressly provides:

"10. International hereby waives all statutory liens, and the benefit of any statutory liens in regard to the work, labor, improvements or storage of said aircraft, upon execution by the Finns of a promissory note and chattel mortgage in the amounts provided hereunder, which promissory note and chattel mortgage the Finns agree to execute as herein provided. International agrees that such mortgage and the manner of payment herein shall constitute its sole rights in this regard."

Section 1 of the Aircraft Lien Act (1 Deering's Gen. Laws, Act 153d; Stats. 1949, ch. 654) which was in effect when the instant documents were executed, reads:

"Every person has a lien dependent upon possession for the compensation to which he is legally entitled for making repairs or performing labor upon, and furnishing supplies or materials for, and for the storage, repair or safekeeping of, any aircraft . . . subject to the limitations set forth hereinafter."

This section was added to the Code of Civil Procedure in 1953 as section number 1208.61.

Also, as stated in 10 California Jurisprudence 2d 505, section 8, citing *Douglass* v. *McFarland,* 92 Cal. 656 [28 P. 687]:

"An action in claim and delivery may be maintained by one who has a qualified interest in the property which is the subject of the litigation, providing he has a right to its possession . . . Accordingly, one who holds property by virtue of a lien may maintain an action to recover it if it is wrongfully taken from him . . ."

It is true, as appellants urge, that the supplemental agreement provided for a waiver of respondent's statutory lien against the aircraft for labor performed and materials furnished in improving it. However, the waiver was not absolute. It was expressly made conditional "upon execution by the Finns of a promissory note and chattel mortgage."

Appellants do not contend that they ever performed the conditions required to effect the waiver. Moreover, it is clear from the record that the note and mortgage which they did execute was for $15,000 *cash* lent to them on August 31, 1951. It was not for work and improvements subsequently

bestowed on the aircraft by respondent. These latter items remained subject to the lien until it was waived in the manner provided, to wit: by execution of the additional note and chattel mortgage.

This was never done; hence there was no waiver of respondent's statutory lien rights on the aircraft.

Appellants next assert that the plane was delivered to respondent for the sole purpose of leasing it to respondent, the repairs being incidental to the lease. And that payment on the note secured by the chattel mortgage was dependent upon performance of the lease by respondent. As a result, respondent having defaulted under the lease, the chattel mortgage cannot be foreclosed.

Nothing in the terms of the agreement, the chattel mortgage or the lease substantiates this position. Moreover, before the lease became effective, delivery of the plane was required to be made to respondent, pursuant to the following provisions of the lease:

"2. *Term.* This lease shall be for a term of eighteen (18) months from and after the 'delivery date,' which is hereby defined as the date when said aircraft is actually delivered to Lessee pursuant to this lease. Said date shall be not later than ninety (90) days after delivery of said aircraft to Lessee for the performance of certain work thereon pursuant to a contract executed concurrently herewith; however, said 90 days shall be extended by such time as is necessary for Lessee to complete the performance of said contract on its part, provided such additional time is not necessitated by any fault of Lessee. Upon the performance of said contract on its part by Lessee, it shall be Lessee's duty to accept delivery of said aircraft, and Lessor's duty to tender such delivery."

It is clearly shown by the evidence, hereinabove recited, that the work contemplated by the contract was not completed at the time appellants took possession of the plane without the consent of respondent. Therefore, delivery of the aircraft for the purposes of the lease never took place.

As related above, respondent was unable to complete and license the aircraft as provided in the agreement because of appellants' failure to provide the items therein specified. Thereafter, appellants requested respondent to put the aircraft into "bare flyable" condition so that it could be used to fly a cargo of tomatoes from Mexico; that they had made arrangements to underwrite a loan at a Los Angeles bank, and that they would pay respondent before the plane left.

On April 18, 1952, appellants stopped this arrangement, brought in their own crew and worked on the plane themselves utilizing respondent's shop equipment. About May 15th, appellants requested permission of respondent to take the plane outside of the hangar to run up the engines and "shake it down." After discussion, respondent granted this request on May 18th. On that day and on each of the two succeeding days, appellants delivered to respondents a letter in which they acknowledged respondent's possession of the plane, and also promised to "redeliver this aircraft to your possession" not later than a certain hour therein stated. In the letter of May 20th, the time of redelivery was extended to 11 o'clock p. m. of May 21st.

At 4:30 in the afternoon of that day, appellants left the plane to get an inspector of aeronautics to check the engines. They returned without the inspector and were met by two treasury agents. The latter and George Finn walked to the Lockheed Air Terminal lobby to talk. When appellants returned to respondent's hangar an hour later, they found that "the airplane had been taken from around the south end of the hangar, where we had been running it up, outside on the runway to the north end of the hangar, and wedged in between the buildings."

Appellants here urge that because they had temporary possession of the aircraft until 11 o'clock that night, it was unlawfully taken from them by respondent.

The main issue in the claim and delivery action is whether respondent had possession of the aircraft and was entitled to its possession on May 25, 1952, when it was seized by appellants. The question of temporary custody of the plane on a previous day was not in issue. Moreover, the letters granting such temporary custody specifically acknowledged respondent's possession of the aircraft.

On the facts disclosed by the record, appellants were obligated by contract to repay to respondent the $15,000 cash loan, as well as the cost of labor and material bestowed on their aircraft. By their wrongful removal of the plane from respondent's possession, appellants deprived it of its statutory lien and the chattel which was security for the cash loan.

In the circumstances, respondent was entitled to prosecute the instant actions of claim and delivery and foreclosure of the mortgage.

Respondent posted a surety bond for $40,000 in the claim and delivery action. On motion of appellants to increase the bond, the court, among other things, ordered them to deliver the plane to respondent at Burbank or at Bakersfield. At the same time, respondent was ordered to file an additional surety bond for $30,000 *within five days after delivery of the plane.*

In their reply brief, appellants urge for the first time that because of its failure to post the additional bond within the time stated, respondent has no right to possession of the plane. In answer to this, the evidence is undisputed that respondent has never received delivery of the plane from appellants.

It is finally contended that the trial court erred in not qualifying George Finn as an expert witness. In order to prove the amount of labor and material bestowed on the aircraft, respondent introduced in evidence a large number of work orders which were made as the work progressed. Appellants took exception to these and stated they wished to show that they had been subjected to overcharges.

In attempting to qualify as an expert witness in the field of aircraft repair, appellant George Finn stated certain qualifications acquired in the United States Airforce as a pilot and as a design and development officer.

The witness admitted that he had never operated a commercial repair shop or performed any conversion or licensing work on a C-46 aircraft, other than some work on his own plane.

And as stated in *Huffman* v. *Lindquist,* 37 Cal.2d 465, 476-477 [234 P.2d 34, 29 A.L.R.2d 485] : ". . . It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence (*Mirich* v. *Balsinger,* 53 Cal. App.2d 103, 114 [127 P.2d 639]), and its ruling will not be disturbed on appeal unless a manifest abuse of that discretion is shown."

An examination of the entire record discloses that appellants were afforded a fair and impartial trial on the issues joined by the pleadings. And, although laymen, they displayed a high degree of skill in presenting their defenses.

For the reasons stated, the judgment is affirmed.

White, P. J., and Doran, J., concurred.