[Civ. No. 9839.  Third Dist.  Mar. 30, 1961.]

C. A. SMITH, Respondent, v. SHASTA ELECTRIC COM-
PANY (Individual's Fictitious Name) et al., Defendants;
WILLIAM COX et al., Appellants.

Barr & Messner and M. H. Messner for Appellants.

Daniel S. Carlton for Respondent.

VAN DYKE, P. J.—This is an appeal by William Cox and Guy Cowart from a judgment rendered against them in an action brought by C. A. Smith to recover damages for the alleged negligent destruction by appellants of Smith's sawmill. The action was tried before a jury. Appellants concede that there was ample evidence to support the charges of negligence, the lack of contributory negligence on the part of Smith and the freedom from neglect on the part of codefendant California-Pacific Utilities Company. William Cox was doing business as Shasta Electric Company and Guy Cowart was his agent. We will refer to Cox as Shasta, and to appellants' codefendant as Pacific.

Smith owned and operated a sawmill near Weaverville, in Trinity County, and had engaged Shasta to renovate part of the electrical system in the mill at a contract price of $6,500. The work was about two-thirds done at the time of the fire, which was caused by defective installation of electrical equipment by Shasta. The mill and the sawmill machinery and other equipment used therein were all completely destroyed. At that time Smith had a contract with the Main Lumber Company for custom work in sawing logs for $16 per thousand board feet with a contemplated total output of five million board feet during the season of 1955. The fire occurred March 25th of that year before the seasonal operation had begun.

It is apparent from respondent's pleading and evidence that he sought to recover, in addition to general damages, profits which, save for the destruction of his mill, he would have made from performing the Main contract for the season of 1955. His pleading was that he had "lost profits on certain agreements he had entered into prior to March 15, 1955; that under said agreements plaintiff was to saw and deliver certain kinds of lumber, . . . for the year 1955;

that by reason of the destruction of his sawmill plaintiff was prevented from performing said agreements; that had the plaintiff completed said agreements in accordance with his usual custom and as he had made arrangements to do, he would have sawed and delivered five million board feet, and the cost of sawing and delivering the same would have been $8.50 per thousand board feet; that by reason of the destruction of his sawmill, plaintiff was unable to saw and deliver any of said lumber; that plaintiff lost profits on said agreements in the sum of $40,000.00; that said loss of profits in the sum of $40,000.00 was the direct and proximate result of the joint and concurrent negligence of each and all of the above mentioned defendants.'' The evidence showed that respondent, for a number of years, had owned and operated his sawmill with related facilities such as a log pond, a lumber yard, and miscellaneous equipment; that he had used the mill for manufacturing lumber for himself from logs that he had purchased, in which cases he sold the manufactured lumber, and for manufacturing lumber from logs he had produced in the woods and transported to his mill, and for custom work such as he had engaged to do for Main. The use of the land and mill and of the log pond and the yard constituted an integration necessary for the operation of the business. The mill itself was, of course, the heart of the operation and the evidence was that when the mill was burned just before the beginning of the milling season for that year, the business was completely stopped. Although there was testimony that in several months' time the mill could have been rebuilt with new machinery and equipment, the Main contract was lost immediately because Main could not wait upon respondent to rebuild his mill; nor was there any other mill available for custom work in Trinity County that season and Main, who operated a complete lumbering business, was compelled to go elsewhere at once and did so. In short, the proof was ample to show that respondent lost the profit he would have made from the Main contract for custom sawing in an amount exceeding the $27,000 allowed by the jury and that this loss was the direct and proximate result of appellants' negligence.

Section 3333 of the Civil Code provides: ''For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detri-

ment proximately caused thereby, whether it could have been anticipated or not."

The evidence showed that respondent's business had a substantial operating experience and there was testimony that in view of the past experience and of the condition of the mill and the attendant facilities respondent's operative costs for the 1955 season in performing the Main contract would have been $8.50 per thousand board feet of lumber and that the gross revenue to be produced therefrom, according to the Main contract terms, would have been $16 per thousand board feet with a gross cut of approximately five million board feet. Under the circumstances, respondent was entitled to compensation for loss of anticipated profits from an established business. It is said in 14 California Jurisprudence 2d, section 55, page 682:

"A plaintiff's right to recover damages for a loss of anticipated profits occasioned by reason of the defendant's tort is now, in contradistinction to earlier decisions, generally determined by the same rules that govern his recovery of damages for other forms of detriment caused by the defendant's conduct. Accordingly, the plaintiff may recover for a loss of anticipated profits if his loss in this regard has directly and necessarily resulted from the defendant's wrongful act. However, the evidence he presents to establish his loss must not be uncertain or speculative. This rule does not apply to an uncertainty concerning the amount of profits that the plaintiff, but for the defendant's act, would have derived from a particular transaction; it refers, instead, to uncertainty or speculation as to whether or not the loss has actually occurred as a result of that act."

The situation here is comparable to that considered by the Supreme Court in *Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193, 199-200 [143 P.2d 12], wherein the court said:

". . . If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded. . . . In the present case plaintiff's probable gross receipts could be estimated from its sales in the preceding two years, in view of the evidence that prices were stable. Its unit costs could be estimated on the basis of detailed figures concerning actual expenses, such as labor, depreciation, insurance, taxes and royalties for the limited operations carried on in 1938. Its plant capacity was conservatively estimated

at 90 tons per day, since plaintiff's old plant using the 'carbonating process' had a proved capacity of from 35 to 40 tons a day, and the capacity of the new 'Mono Process' plant had been increased from 50 to 100 tons a day. Awards of prospective profits have been sustained on the basis of much less satisfactory evidence. . . . Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated."

The case before us meets every test for awarding damages for loss of anticipated profits. Apparently, the jury allowed $27,000 for this item out of a total award of $77,000, the evidence being without substantial conflict that the direct loss from the burning of the mill amounted to $50,000.

■■■ Appellants assign error in the giving by the trial court of Instruction Number 23, reading as follows: "The law holds no one responsible for exposing his property to danger of which he knew nothing, and of which he could know nothing, by exercise of ordinary care under all the circumstances." The instruction was a proper one in view of the evidence. Contributory negligence had been pleaded and it was claimed that the mill should not have been operated while the appellants' work had not been completed. The evidence was that appellants had installed undersized wire which was overfused, with the result that when current passed through, the wires heated to a point where molten metal fell upon the floor, from which the fire resulted. It was also shown that respondent was unaware that this dangerous situation existed. It was proper, therefore, to instruct the jury as the court did.

■■■ Appellants assign error in the giving of Instruction Number 49, reading as follows: "Section 2331(a) of the Administrative Code of California, which is an Electrical Safety Order of the Division of Industrial Safety of the State of California, provides as follows: 'Each service entrance conductor except grounded neutral conductors, shall be protected by an approved overcurrent protective device . . . .' " This instruction was properly given, since respondent's charge of negligence was principally based upon a claim that the fire had been caused through overheating of conductors installed by appellants, which were undersized and overfused. There was testimony that by installing these conductors appellants had violated the quoted safety order. Appellants argue that the rule does not apply to uncompleted work, but the evidence was that appellants had completed

that part of the work. Cowart testified that it was completed and ready for use. The instruction was a proper one.

■ Appellants assign error in the receipt in evidence of respondent's Exhibit Number 9, which was a letter written to respondent's attorney by the Chief of the Division of Industrial Safety, informing the attorney that his request that a Mr. Stanley be permitted to attend the trial as a witness for respondent could not be granted because of pressure of work and availability of other competent electrical engineers. Mr. Stanley, however, did appear and testify as a witness for defendants. While respondent was on the stand under cross-examination counsel for Shasta asked him about various conversations he had had with Stanley relating to orders given to him that he make corrections in electrical equipment in the mill. Counsel for Pacific, cross-examining in turn, asked respondent if Stanley had not once said to him: "Now, Mr. Smith, if I did take the witness stand in this case it would be against you?" He was then questioned further: "Q. He didn't tell you if he would come in he would have to be against you? A. He didn't tell me that exactly, no. Q. What did he tell you? A. He said, 'I don't think I can do you any good,' or something to that effect. Q. He said, 'I don't think I can do you any good,' is that right? A. But previous to that he had told us some other things, and that is the reason he [respondent's counsel] wanted to see him." It appears that respondent had asked Mr. Stanley to discuss the case with his counsel. The apparent implication which appellants' codefendant was seeking to establish here was that respondent had been warned by Stanley concerning defective equipment in his mill and the need for correction. By way of rehabilitation respondent's attorney sought the introduction of the letter, Exhibit Number 9, to show that an effort had been made to produce Stanley, indicating that respondent was not afraid of what Stanley might do to his case as a witness and that in part Stanley's chief did not want him to use his time as a witness in the case because, first, other competent electrical engineers were available as experts, and second that it was the opinion of Stanley's chief that: "Mr. Stanley could not add anything of value in this case" and that "For this reason, and because we feel that the activities of our small staff are taxed to the utmost, we believe that Mr. Stanley's time could be better utilized in his normal work." The letter continued: "Based on the foregoing statements, we respectfully ask that you reconsider your request for Mr. Stanley's services."

Stanley did appear and testify as a defense witness. The incident was of little importance in a case that featured extensive testimony by a number of experts testifying as witnesses for both sides, but we think that the letter was properly introduced in evidence in rehabilitation.

Appellants assign error in an order of the court striking the testimony of the witness Holmes, a witness testifying in behalf of appellants. The ground of the order was that he was unqualified to give expert testimony on the subject concerning which he was questioned. Appellants argue that Holmes, who testified he was a safety engineer and did not know much about the value of sawmills, said that because his business was with sawmill machinery he kept up on the question of the value of individual pieces of equipment such as were in respondent's mill. He said he had no particular knowledge of the value of a mill, as such, in operable condition. They argue that his testimony was admissible on the piece-by-piece values insofar as respondent had "elected to treat this sawmill as individual pieces of equipment." It is clear from the record that no such election had been made by respondent and that, on the contrary, he was seeking damages measured by the loss of the complete and operable mill. Holmes testified that the piece-by-piece value of the equipment in the mill was $17,650. On *voir dire* touching his qualifications, Holmes testified to the following effect: I am in safety work for the Division of Safety of California. I have never sold, bought, or operated a sawmill, nor have I worked in one within the last 10 years. I am fully employed by the state for practicing the profession of safety engineering and I devote my whole time to it. I valued a sawmill in Trinity County at Hoopa. It was in place and operating. I have never testified as to the value of a sawmill. The following then occurred: "The Court: The reasonable market value as of the date of the fire. The reasonable market value not as a result of a forced sale, but what the mill would have brought on the open market giving a reasonable time to make the sale and find the purchaser and a reasonable time to make the deal. Do you feel you have an expert opinion on that at the present time, or are you just adding up how much you think the saw was worth and the edger and the cutoff and other things? A. I had only considered, your Honor, the replacement value of the sawmill facilities themselves without burners, pond or land. . . . As a going concern prior to the time it burned, I hadn't prepared an estimate on that. . . . I wasn't asked to give an opinion

on the market value of the going operation. Q. And you haven't purported to give an opinion on the market value of the going operation? A. No. Q. Not at all here? A. No. Q. And your figure of $17,650.00 doesn't represent that? A. Only the replacement value of the sawmill and the machinery in it. . . . Q. What value did you attach to the fact the mill was sitting on land that was designed for its use? A. None. Q. What value did you attach to the burners that were designed to be used in connection with the mill? A. None. Q. What value did you attach to the road system that had been developed on the grounds that were to be used in connection with this mill? A. None. Q. What value did you attach to the unloading facilities that were designed for the purpose of being used at the mill, at the pond? A. None. Q. What value did you attach to the fact that the ground had been leveled, and otherwise prepared, for utility in connection with the operation of the mill? A. None. . . . Q. Mr. Holmes, didn't you say the $17,650.00 was in your opinion a fair market value of this Smith mill at Weaverville on the physical property on which you observed it? A. No. . . . I am not prepared to give that opinion.'' Thereupon, on motion, the court struck the testimony of the witness as to the value of the mill. While it is difficult to be sure from the record just what the witness took into consideration in fixing the value to which he testified, it seems extremely doubtful that he ascribed any value to the fact that at the time of the loss the mill was an operational unit of a going concern. Furthermore, Mr. Holmes' work was not such as to particularly qualify him to pass upon the value of the sawmill. He was not shown to have had anything more than a very superficial experience as to such value.

As stated in *Huffman* v. *Lindquist*, 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485] : ''. . . It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citing case], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown.''

We think the trial court acted within the limits of judicial discretion in striking the evidence of Mr. Holmes offered as an expert upon the issue of value of the destroyed mill.

Appellants assign as error the refusal of the trial court to allow in evidence the tax assessment sheets of the county assessor as affirmative evidence of value of the de-

stroyed property. "The valuation placed on property by a tax assessor is not competent evidence of its fair market value." (18 Cal.Jur.2d, § 169, p. 629; see also *Everts* v. *Matteson,* 68 Cal.App.2d 577, 581 [157 P.2d 651].)

Nothing else requires discussion.

The judgment appealed from is affirmed.

Peek, J., and Schottky, J., concurred.