[Civ. No. 25539. First Dist., Div. Three. Dec. 11, 1969.]

JOSE SOLORIO et al., Plaintiffs and Appellants, v.
GEORGE W. LAMPROS et al., Defendants and Respondents.

## COUNSEL

Jennings, Gartland & Tilly and John Victor Tilly for Plaintiffs and Appellants.

Rankin, Oneal, Luckhardt, Center, Ingram & Bonney and William A. Ingram for Defendants and Respondents.

## OPINION

**DRAPER, P. J.**—Plaintiffs sought damages from three doctors and a hospital for the death of their son, allegedly the result of malpractice. The sole experts called by plaintiff in this jury trial were the defendant doctors. Motions for nonsuit were made when plaintiffs rested. The court offered plaintiffs an opportunity to present additional medical evidence. The offer was not accepted, and nonsuit was granted as to all defendants. Plaintiffs appeal only from the judgment in favor of Drs. Lampros and Truitt.

Raul A. Solorio, 22, accompanied his parents when they took his 4-year-old brother to the hospital emergency room March 6, 1964, for treatment of lacerations. As the brother's lacerations were being cleaned, Raul apparently fainted. He fell backward, striking his head on the steel frame of a bed and then on the floor. Dr. Lampros, a general practitioner, examined and treated Raul. The next morning, he visited the patient again, and called Dr.

Truitt, a neurologist, for consultation. The two doctors examined the patient, and left orders that one of them be called by the nurses if specific conditions arose. They did not specify that the call should be made to Dr. Truitt. At about 8 a.m., March 8, the specified condition was observed by the nurses. In accordance wth hospital policy, they called the admitting physician, Dr. Lampros. He arrived at the hospital between 8:45 and 9 a.m., saw the patient, and called Dr. Truitt. The latter arrived at about 10 a.m. Between 10:30 and 11 a.m., Dr. Truitt ordered the hospital staff to prepare for an arteriogram, a procedure in which there is placed in blood vessels of the neck a dye which moves to the brain and shows up in X-ray photos. This procedure will in some cases, but not all, reveal a hematoma, which is an accumulation of blood. Simultaneously with this direction to the hospital staff, he called Dr. Becker, a neurosurgeon. Some 45 minutes after the order to prepare for the arteriogram, the patient developed difficulty in breathing. Dr. Truitt had a tube put down the windpipe to facilitate breathing, and determined not to proceed with the arteriogram. Dr. Becker arrived at the hospital between 12:15 and 12:30 p.m., talked to Dr. Truitt, and went to the operating room. Surgery began at 1:05 p.m.. Dr. Becker made burr holes in the patient's skull and explored through them in an effort to find a hematoma which could be relieved. Although he did remove small quantities of blood, he found no sizeable hematoma and concluded that the patient had an intracerebral injury with brain softening, and that no further surgery was indicated. Raul was returned to the ward, where he died at 5:55 a.m.

■ Autopsy revealed that the patient had suffered skull fractures, epidural and subdural hematomas, and brain contusions. It revealed a large epidural hematoma in the frontal area. Dr. Truitt felt that this hematoma was the immediate cause of death. There is testimony that Drs. Becker and Truitt, in a conversation after they had received the autopsy report, agreed in retrospect that an arteriogram performed after the burr holes had been placed probably would have revealed the bleeding and that the large hematoma might have been evacuated.

Plaintiffs point to the established rule in review of nonsuit that conflicts in the evidence must be resolved, and all reasonable inferences drawn, in plaintiffs favor (*Raber* v. *Tumin*, 36 Cal.2d 654, 656 [226 P.2d 574]; *Card* v. *Boms*, 210 Cal. 200, 202 [291 P. 190]). They contend that, so viewed, the evidence shows that an arteriogram would have revealed the hematomas, which could have been relieved surgically, and that if the nurses had been instructed to call Dr. Truitt rather than Dr. Lampros, this procedure could have been performed before development of the distressed condition which forced Dr. Truitt to cancel his order for the arteriogram.

But even if this thesis be fully granted, there is no evidence that failure to

perform an arteriogram in any way fell below the standards of skill and learning of practitioners in the area. Such proof is necessary (e.g. *Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604]). Usually, it is supplied by expert testimony, but when failure to meet the required standard is demonstrated "by facts which can be evaluated by resort to common knowledge, expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact" (*id.*). This is not such a case. We find no decision directly in point, but it seems clear that the intricate, delicate, and dangerous field of brain surgery is beyond the common knowledge of laymen (see *Huffman* v. *Lindquist,* 37 Cal.2d 465, 474-475 [234 P.2d 34, 29 A.L.R.2d 485]).

There is, moreover, uncontradicted evidence that an arteriogram will have deleterious effects in from three to six percent of all cases, and that in light of the extensive brain injury here could well be harmful. This state of the record emphasizes the need for expert evidence to fill the gap in plaintiffs' case. The trial judge specifically offered plaintiffs the opportunity to fill the void by producing expert evidence that the standard of medical care required use of the arteriogram, but the offer was rejected. Thus there is no evidence of any deviation from the required standard of care, and the nonsuit was properly granted.

In light of this conclusion, it is unnecessary to discuss the other contentions of plaintiffs.

Judgment affirmed.

Brown (H. C.), J., and Caldecott, J., concurred.