Ann E. HOYLE, Executrix of the Estate of Harriet Evans, Deceased, Plaintiff,

v.

SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.

No. SH–C–79–31.

United States District Court,
W. D. North Carolina,
Shelby Division.

Aug. 21, 1979.

Fred A. Flowers, Shelby, N. C., for plaintiffs.

James M. Bowen, Rutherfordton, N. C., R. Frost Branon, Jr., Charlotte, N. C., for defendant.

## MEMORANDUM OF DECISION

WOODROW WILSON JONES, Chief Judge.

The Plaintiff initiated her lawsuit in the Superior Court of the State of North Carolina. Defendant removed it to this Court on the basis of diversity of citizenship. Presently the action is before the Court upon the Defendant's motions to dismiss and for summary judgment pursuant to Rules 12(b)(1) and 56, Federal Rules of Civil Procedure (FRCP). A hearing was conducted on the motions on July 23, 1979 in Rutherfordton.

At the beginning of the hearing, Plaintiff's attorney complained that he had not been afforded the ten-day notice for a summary judgment motion as provided for by Rule 56(c) FRCP. It did appear that only nine days had elapsed since notice was served and the Court agreed to postpone the hearing until later in the term. However, upon agreement by the attorneys for the parties, the motion was heard on July 23, 1979 with the stipulation that both sides would have ten days subsequent to the hearing in which to submit affidavits and

briefs. The Plaintiff thereafter filed additional affidavits and a second brief. After a careful consideration of the record, affidavits, briefs and arguments of counsel the Court now enters its findings and conclusions.

■ Initially Defendant argued in an oral motion to dismiss that the Court had no jurisdiction over this case, the proper forum being the North Carolina Utilities Commission. While the cases discussing this issue each turn on the particular state statutes, the general rule is that actions sounding in tort are properly brought before a trial court rather than the Utilities Commission. 67 A.L.R.3d § 2(b) pp. 85–87. Therefore, on the record at this time, the Defendant's motion to dismiss for lack of jurisdiction should be denied.

For the purpose of consideration of the summary judgment motion only, the Defendant has stipulated as accurate the facts as found in the depositions of the Plaintiff and Dr. John Hunter. Those depositions reveal the following facts: Plaintiff's testatrix, Harriet Evans, was a widow, aged 66 at the time of her death. She lived alone and had been a subscriber of the Defendant for many years. On January 9, 1978, her telephone was out of order, but the Defendant repaired it that same day. The telephone again went out of order on January 11, 1978. While the problem was reported to the Defendant and the Defendant indicated it would repair the telephone that day, it was in fact not repaired until two days later, January 13, 1978.

Plaintiff's deposition also indicates that Plaintiff's mother, the testatrix, suffered a hemorrhage at about 1:00 a. m. on Friday, January 13, 1978. It appears that the testatrix attempted to call for help but could not as the telephone had not been repaired. Plaintiff's mother was not taken to the hospital until approximately 11:15 on the morning of January 13, 1978. Dr. John Hunter, the testatrix's family physician arrived at the hospital at approximately 11:30 a. m. Dr. Hunter testified in his deposition that the testatrix told him she had been bleeding for twelve hours or more. The doctor felt testatrix was in shock due to loss of blood and treated her accordingly. Fluids were administered in the emergency room and a blood transfusion was given. One pint of blood was available in Shelby and was given to the testatrix. However, additional blood had to be ordered from Charlotte. According to the hospital records read by Dr. Hunter, the testatrix received blood around 2:00 p. m. and a pack cell of red blood cells at 5:00 p. m. The testatrix did not receive all of the pack cell because the needle plugged up. At that time Dr. Hunter ordered that she be taken to the emergency room where he was going to perform a cut-down, opening up the vein and inserting a catheter directly into it. However, according to Dr. Hunter's testimony this procedure was never done, as the testatrix died in the elevator on the way to the emergency room.

Further stipulated facts reveal that Dr. Hunter's admitting diagnosis was acute gastric hemorrhage, number one; number two, chronic gastric hemorrhage. Dr. Hunter explained that chronic gastric hemorrhage meant that the Plaintiff had been bleeding for a good many hours before she came to the hospital. Dr. Hunter stated that it was possible the ulcer had been bleeding for as many as three days. At the time of the testatrix's death, Dr. Hunter diagnosed chronic gastrointestinal disease from history, possible coronary infarction. He stated that it was possible that she had had a heart attack that had nothing to do with the ulcer. Dr. Hunter then stated that the infarction was probably due to the loss of blood but that without an autopsy there was no way of knowing exactly what caused the testatrix's death. Dr. Hunter read from the testatrix's records the following:

"This 66-year old female died about six hours after her admission to the hospital with acute gastric hemorrhage superimposed upon, apparently, what was chronic gastric hemorrhage over several days, according to the history. The patient, while being transferred and showing slight improvement from her room to the intensive care unit, had a standstill on the elevator and she received prompt coro-

nary pulmonary rescuscitation, but to no avail. The patient received in the hospital after she was admitted Dextran 40 for support, plus one unit of blood as soon as it was available, another unit of red blood cells, although this did not get in due to the plugging up of the needle. She also received one unit of plasma. The plasma, however, was given before the red blood cells went in. Other units of blood were brought in from Charlotte hospital and I was ready and the patient was taking the new blood in her left arm when she was transferred to the intensive care unit. The patient had a cardiac standstill on the elevator while going to the intensive care unit. The diagnosis was acute gastric hemorrhage, chronic gastric hemorrhage, history in brackets, possible coronary infarct, cause undetermined." (Hunter Deposition 37–38).

Dr. Hunter testified several times that the delay in getting Plaintiff to the hospital contributed to her death. On the other hand, the doctor repeatedly indicated that bleeding ulcers are unpredictable and that it is never known how people will respond or whether or not their lives can be saved. Further he stated that even if he could have operated on Mrs. Evans at 3:00 a. m. there was no way of knowing whether her life would have been saved. Dr. Hunter further reported that after her admission to the hospital her bleeding had slowed down considerably and in fact the testatrix had improved and suddenly she "went bad on me on the elevator." (Hunter Deposition 55).

The depositions also reveal that the testatrix, Mrs. Evans was seen by Dr. Hunter several times in January 1978. The latest time prior to her hospitalization was on January 11, 1978. On January 3, 1978 Dr. Hunter stated that the testatrix's chief complaint was arthritis of the rib cage on the left. On January 11, 1978 her main problem was pain in her feet as well as some low back pain. The doctor prescribed medication for pain in the joints on the last visit. Dr. Hunter stated that when he saw testatrix on January 11, 1978, he had no reason to suspect that there was any emergency about her condition.

At the oral hearing on the Defendant's motions, the Plaintiff submitted several affidavits. Mrs. John Roberts testified in her affidavit that on January 12, 1978 she called the Defendant and reported that the testatrix's telephone was out of order. She also stated that she told the Defendant that Mrs. Evans was ill. Mrs. R. W. Rucker testified that on January 11, 1978 Mrs. Evans reported her telephone to the Defendant and told them that she lived alone and had not been well.

Allegations by the Defendant in its Fourth Defense as set forth in the answer indicate that during the time complained of, Shelby, North Carolina was experiencing extreme winter weather conditions. The Defendant contends that icing caused a substantial loss of power and transmission facilities which led to numerous disruptions in telephone service. Supporting these allegations by the Defendant are its answers to Plaintiff's interrogatories.

The Defendant's Exhibit A to its answers to Plaintiff's interrogatories indicates that some six hundred and fifty persons called Defendant for repair service of their telephones during the period January 9–12, 1978. In addition Defendant indicates that fifty-five persons with unpublished numbers called for service making a total of over seven hundred reports of telephones which were out of order during the time in question. At the hearing the Defendant stressed the issue that weather conditions were adverse in Shelby during January, 1978. The Plaintiff did not deny that this was so, nor did she come forth with any evidence to the contrary.

 Summary judgment is appropriate only when ". . . there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) FRCP. This determination is made based upon the pleadings, depositions, answers to interrogatories, admissions on file and any affidavits filed in support or against the motion. While the moving party has the burden of coming forward with evidence in support of its motion, ". . . an adverse party may

not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(c) FRCP. *White v. Boyle*, 538 F.2d 1077, 1079 (4th Cir. 1976).

In determining an action based upon diversity jurisdiction the Court is bound by the law of the forum state. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). An examination of the law in North Carolina reveals a factually similar case, *Whitehead v. Telephone Co.*, 190 N.C. 197, 129 S.E. 602 (1925). In *Whitehead* the plaintiff alleged that he owned a house which was destroyed by fire. The fire began around 3:00 a. m. and the plaintiff attempted to get a response from the central office of the defendant for the purpose of notifying the local fire department. He was unable to get an answer to his call or any communication with the fire department. Upon a demurrer, the defendant raised the following issues: that the allegations relating to proximate cause were inferences or conclusions not deducible from the substantive facts nor admitted by the demurrer; that circumstances alleged were not such as to have admonished the defendant that its omission would probably result in the injury to the plaintiff and that the essential proximate connection between the alleged negligence and the alleged loss was not susceptible of satisfactory proof. In affirming the defendant's demurrer in *Whitehead* the court discussed the principle of proximate cause and held that upon the facts the causal relation between the alleged negligence and the alleged injury was too remote to support the action.

In an earlier North Carolina case, *Hodges v. R.R.*, 179 N.C. 566, 103 S.E. 145 (1920), the Court overruled a demurrer by the defendant. In that case the plaintiff alleged that he had made arrangements with a physician to be on standby and to come when summoned by telephone to aid plaintiff's wife during childbirth. The defendant in this case was the railroad company and not the telephone company. Plaintiff alleged that the defendant willfully and without notice cut the telephone lines which was a misdemeanor. The court quoted from a prior North Carolina case, ". . . when one does an illegal or mischievous act which is likely to prove injurious to another . . . he is answerable in some form of action for all of the consequences which may directly and naturally result from his conduct." *Hodges* at 570, 103 S.E. at 146 quoting from *Drum v. Miller*, 135 N.C. 204, 214, 47 S.E. 421 (1904). The Court further found that if the allegations of the complaint were true then the failure of the physician to arrive in time ". . . was the direct result of the *unlawful* act of the defendant." *Hodges*, 179 N.C. 570, 103 S.E. 146 (emphasis added).

In addition to the two North Carolina cases, there have been a few decisions in other jurisdictions. See Annotation 67 A.L. R.3d 76 (1975). A 1914 Alabama decision allowed recovery for a plaintiff who suffered injuries when he had to walk one and one half miles to obtain medical aid for his child after attempting to use a telephone which failed to work. *Vinson v. Southern Bell Tel. & Tel. Co.*, 188 Ala. 292, 66 So. 100 (1914), 67 A.L.R.3d 96. The Court found that when telephone service is insufficiently or ineffectually afforded, the presumption prima facie is that the negligence of the telephone company is the cause of the defective service.

The opposite result was reached in *Southern Bell Tel. & Tel. Co. v. Reynolds*, 139 Ga. 385, 77 S.E. 388 (1913), 67 A.L.R.3d 98, a case similar to *Whitehead*. Recovery was denied even though there was evidence that the family physician had been alerted to the imminence of the plaintiff's delivery and would have responded immediately when called. In another Georgia case concerning an expectant mother and the inability to summons the ready and willing doctor, the court denied recovery, holding that proximate causation could have been found as the evidence showed that ". . . the doctor would have immediately responded and would have arrived in time to save the subscriber's wife . . . ," but that the telephone company had not been negligent.

67 A.L.R.3d 98. The proper rule according to the court was that:

> ". . . if a telephone company furnishes facilities equal to those in general use, and uses ordinary care to keep them in proper working order, and to furnish the subscriber the service for which he has contracted, the subscriber cannot hold the company responsible for its failure to make a prompt connection in a given instance." 67 A.L.R.3d p. 99.

The North Carolina case, *Whitehead* is discussed in the annotation along with several others to support the rationale of denying recovery on the basis of lack of proximate cause. 67 A.L.R.3d 103.

 In viewing the facts of Plaintiff's case in light of the law across the nation and in particular in North Carolina, it appears that the action cannot proceed to trial. In the first instance, assuming all of the Plaintiff's facts to be true, there has not been shown nor could there be any showing of negligence on the part of the Defendant. The evidence could not support a finding that the Defendant had acted unreasonably in not repairing the testatrix's telephone for two days, until January 13, 1978. There is no evidence to show that Defendant was informed of a medical emergency. The Plaintiff's affidavits indicate that at the most, the Defendant had been told Mrs. Evans was not well. Assuming that Plaintiff's facts could support a finding of negligence the Defendant's answers to the interrogatories reveal that due to severe weather conditions there was an unusually large number, over seven hundred, of requests for service by subscribers during the period January 9–12, 1978. The Defendant had to call in eight to ten additional repairmen within a short time to repair damage to telephone calls prior to or during January 9–12, 1978. Upon stipulated and unrebutted evidence of record, the Defendant's two-day period which it took to repair Mrs. Evans' telephone could not be considered unreasonable.

Assuming arguendo that upon the facts alleged the Plaintiff could show that Defendant's conduct was negligent, there could still be no recovery because the necessary element of proximate cause is missing.

Under the law in North Carolina, the Plaintiff can not show that Defendant's failure to repair Mrs. Evans' telephone was the cause of her death such as would constitute actionable negligence. As expressed by the court in *Hall v. Coble Dairies*, 234 N.C. 206, 67 S.E.2d 63 (1951) proximate cause is

> ". . . the cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and from which a person of ordinary prudence could have reasonably foreseen that such a result, or some similar injurious result, was probable under the facts as they existed." 234 N.C. 214, 67 S.E.2d 68–69 (1951).

It is questionable whether the Defendant could have reasonably foreseen that the testatrix would become suddenly ill or have a similar emergency. While it is assumed that the Defendant knew that Mrs. Evans was ill, it had no way of knowing there was any emergency. In fact, her own doctor who examined her on January 11, 1978 observed nothing to indicate she had any acute medical problems. All subscribers depend on their telephone to summons help, but the Defendant can not be held liable for non repair in every instance. There could be some instances which might imply a presumption of knowledge of an emergency such as if the hospital's telephones were out of order, but that is not the situation in this case.

Again, assuming that Plaintiff could overcome the foreseeability problems there are other causation problems. While the Plaintiff contends that she can show that the doctor was ready and able to attend the testatrix at 1:00 a. m. on January 13, 1978; that the rescue squad could have transported her and that the hospital would have accepted her, there are too many other speculative factors which can never be resolved. Dr. Hunter's testimony is ambivalent at best, concerning whether or not the testatrix would have lived had she arrived at the hospital earlier. He testified that the delay was a contributing cause, an indirect one, and made other similar state-

ments. However, he also stated that with a hemorrhage you never knew how a patient would respond; that you never knew whether they would recover or not. Dr. Hunter stated that even if he could have operated on the testatrix in the early morning hours, there was no way to tell whether or not her life would have been saved. Most significantly Dr. Hunter testified that Mrs. Evans had begun to respond to treatment and her condition was better and that suddenly she "turned bad." The hospital report prepared by Dr. Hunter corroborates the fact that Mrs. Evans was improving and that the cause of death was a possible coronary infarct. Dr. Hunter testified that the infarction could have been totally unrelated to the hemorrhage but that in his opinion the loss of blood contributed to it. It should also be noted that additional blood had to be ordered from Charlotte and that a needle plugged preventing Mrs. Evans from receiving the entire pack cell. All of these variables lead to the conclusion that it would be impossible for the Plaintiff to show that the act or omission of the Defendant was the proximate cause of the testatrix's death. In *Whitehead* the court gave a definition of proximate cause as

". . . the proximate cause of an event is the efficient cause, that which [in] natural or continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." 190 N.C. 199–200, 129 S.E. 603–604 (1925).

Just as the court in *Whitehead* found that there was too much supposition and speculation involved in determining the causal connection between the faulty telephone and the Plaintiff's damage, the instant case hinges on many facts which can never be determined.

Finally, in analyzing the facts in the instant case, it must be remembered that Plaintiff's hemorrhage occurred first, without which there would have been no emergency—no need to use the telephone. In a California case, a young boy suffered a brain injury in an automobile accident. *Huffman v. Lindquist*, 37 Cal.2d 465, 234 P.2d 34, 29 A.L.R.2d 485 (1951). After be-

ing at the hospital for approximately twenty-four hours, the boy died of a pulmonary embolism. He stopped breathing although his heart was still beating. The parents sued the hospital for negligence because two pulmotors failed to function and the boy could not be revived. In upholding a judgment of nonsuit the court conceded that

". . . the hospital's failure to have its pulmotors in working order might constitute actionable negligence under some circumstances, but there is no evidence that such failure was the proximate cause of the boy's death—that the boy would have lived if the first two pulmotors had worked . . ." 37 Cal.2d 480, 234 P.2d 44, 29 A.L.R.2d 498.

Likewise, in the instant case, there is insufficient evidence to indicate that the testatrix would have lived had she arrived at the hospital at an earlier time. Therefore, there can be no finding that the Defendant's conduct was the proximate cause of the testatrix's death and summary judgment must be granted in favor of the Defendant.

In summary, the Court finds that as a matter of law based upon the facts in the case and the law in North Carolina, the Defendant's delay in repairing the telephone was not unreasonable. Further, the testatrix's hemorrhage was an event which could not have been reasonably foreseen by the Defendant. Finally, it is impossible to determine what the testatrix's condition would have been even if she had received medical help at an earlier time and therefore proximate causation cannot be attributed to the unrepaired telephone. Therefore, there can be no recovery by the Plaintiff in an action in tort and summary judgment must be granted for the Defendant.

A judgment in accordance with the above findings and conclusions shall be entered simultaneously herewith.